Clayton L. HANSON et al., Appellees,

v.

IOWA STATE COMMERCE COMMISSION et al., Appellants.

Ronald L. CARLSON et al., Appellees,

v.

IOWA STATE COMMERCE COMMISSION et al., Appellants.

No. 2–57484.

Supreme Court of Iowa.

March 19, 1975.

Don C. Uthus, Commerce Counsel, and Daniel J. Fay, Asst. Commerce Counsel, Des Moines, for appellant Iowa State Commerce Commission.

Gamble, Riepe, Burt, Webster & Fletcher, Des Moines, Mahoney, Jordan & Statton, Boone, and Johnson, Burnquist, Erb, Latham & Gibb, Fort Dodge, for appellant Iowa Power & Light Co.

Doran, Doran, Doran & Courter, Boone, for appellees Carlson et al.

McCarville, Bennett, Beisser & Ferguson, Fort Dodge, for appellees Hanson et al.

UHLENHOPP, Justice.

This appeal involves the meaning of § 489.18, Code 1973. That section provides:

> · The state commerce commission shall have power of supervision over the construction of said [electric] transmission line and over its future operation and maintenance. Said transmission line *shall be constructed near and parallel to the right of way of the railways of the state or along the division lines of the lands, according to the government survey thereof, wherever the same is practicable and reasonable,* and so as not to interfere with the use by the public of the highways or streams of the state, nor unnecessarily interfere with the use of any lands by the occupant thereof. (Italics added.)

■ We understand "the division lines of the lands, according to the government survey thereof" to mean section lines, quarter-section lines, and quarter-quarter-section lines, which divide land into 640-acre, 160-acre, and 40-acre tracts respectively. Original Instructions Governing Public Land Surveys of Iowa, 33, 123 (Iowa Engineering Society, 1943). See 43 U.S.C.A. §§ 751–753; 3 Stat. 566 (1820); 4 Stat. 503 (1832); Coal Creek Coal Co. v. Chicago, T. H. & S. E. Ry., 114 Ind.App. 627, 53 N.E.2d 179.

Iowa Power & Light Company (Iowa Power) and three other utilities concluded that a need exists for a 345,000-volt electric transmission line from a place of origin near Sioux City, Iowa, to a point near Fort Dodge, and thence to a terminus near Des Moines. The point near Fort Dodge is approximately east of the place of origin near

Sioux City and the proposed line would run mostly east-west between those places, but the terminus near Des Moines is southeast of the point near Fort Dodge. The controversy is over the route of the line between the latter two places, that is, which of three principal possibilities shall be utilized: (a) a route following division lines of lands (the legs of a right triangle or several right triangles), or (b) a route following an existing southeasterly railroad right of way (nearly the hypotenuse of the right triangle), or (c) a route in a diagonal direction southeasterly (substantially the hypotenuse). The first possibility would of course be longest, involve the most farms, cost most, and require the greatest number of structures to hold the transmission cables.

Iowa Power made a study of various routes and narrowed the field to nine. Those nine contained variations of the three main possibilities we have listed. Through its engineer, Ells Cackler, Iowa Power then decided upon a proposed route which falls under possibility (c), a diagonal route between the point near Fort Dodge and the terminus near Des Moines. Mr. Cackler later made minor amendments to that route.

Subsequently Carl Schnoor, the engineer of Boone County, proposed a route which would follow land division lines for the most part. Charles G. Tefft, a commerce commission engineer, refined the Schnoor route.

Close examination of Mr. Cackler's testimony reveals that he chose the Iowa Power route on the basis of which of the routes appeared the most practicable and reasonable—a comparison of routes. He selected the Iowa Power route over routes which fell under (a) (division lines of lands) or (b) (the railroad right of way) for the essential reason that it would be the simplest and cheapest. For example, as to the Schnoor-Tefft route Mr. Cackler testified, "This alternate was rejected primarily because it is ten miles longer than the proposed route. This route would affect more property owners and cost $780,000 more than the proposed

route." He also testified, "The route proposed in these consolidated proceedings and as amended by testimony today is in my opinion the best and most practicable route between Sycamore Substation [Des Moines] and Raun Substation [Sioux City] and is much preferable to any of the alternate routes considered." Again, "It is the most direct route and one which will least inconvenience property owners and the general public who reside in [the counties in question]." Again, "Q. Is the only reason for rejecting this [Schnoor-Tefft] route the fact that it would result in a longer line? A. Longer line, more interference with additional property owners, more acres of land that would be involved in the building of the line." Again, "In this particular route which we have selected from Lehigh [Fort Dodge] to Sycamore [Des Moines] we feel that we have selected the route that interferes with the least number of landowners . . . . As the line length increases, then we are going to cause an interference on more property. In this case, let's say approximately ten miles more. Ten miles means another 180 acres. There's 18 acres to the mile in the right of way strip. These are the things we looked at in addition to the cost, the interferences with landowners, and therefore the shortest line route which causes the least interference most generally becomes the most acceptable one." Again, "I do not consider [the Schnoor-Tefft route] as good a route as the proposed route because of the additional interferences that are created; namely, more property owners affected, greater lengths of line. There are more structures." Again:

Q. How much longer than the proposed route is the route proposed in Mr. Tefft's testimony [Schnoor-Tefft route]? A. It is in excess of ten miles longer.

Q. Would this alternate require the procurement of more or fewer easements than the route proposed by Iowa Power? A. More. Twenty-nine more.

Q. Twenty-nine more parcels of land would be affected, is that your testimo-

ny? A. Twenty-nine more landowners would be affected.

Q. In terms of acreage, how much does this mean? A. Eighteen acres per mile, or in excess of 180 acres.

Q. So it is your testimony that more private property would have to be utilized and more property owners affected under the proposal submitted [in] Mr. Tefft's testimony as opposed to the route proposed by Iowa Power? A. That is true. I have looked at it from the standpoint that over the length of the line that we are considering here as an alternate route, our proposed route involves 122 landowners. The proposed alternate to that is 151 landowners. That figures out 23 per cent greater inconvenience, greater number of landowners affected.

Q. I believe you mentioned that additional structures would be necessary under the alternate proposed in Mr. Tefft's testimony. Do you know how many additional structures would be necessary? A. That is correct. As you increase the length of a line and make a squared-off route, the extra ten miles would call for an additional 40 or 44 structures.

Q. In this day and age I'm reluctant to mention the subject matter of money, but I assume in view of the fact that the Tefft proposal is longer than the one submitted by Iowa Power, that it would also be costlier, would it not? A. Yes. At the average cost that we have quoted before of $78,000 per mile, this cost would run in excess of three-quarters of a million dollars . . . . .

Q. Is it reasonable and practicable, in your opinion, to use more private property, obtain more easements, erect more structures and spend more money than is necessary to construct an electric transmission line? A. It is not.

Mr. Cackler also testified, "I am saying that the route that we have selected is the best route, in my opinion, that we could have from Raun to Lehigh to Des Moines." Again, "I am trying to testify that the

route, as selected by Mr. Schnoor, Mr. Courter, and made a viable route by Mr. Tefft's alterations, when that is modified by the factors of being reasonable and practical, that then our route is the most practical route in the case." Also, "It is my opinion again that when the legislature said that we should follow railroad rights of way and division lines when it was reasonable and practical to do so, that that's exactly what they meant. But when we could select a route that was more convenient for landowners, affected less landowners, was lower in cost for the consumer, created less interference, had less angles, became a straighter line, that this was their intent in saying reasonable and practical."

As required by chapter 489 of the Code, Iowa Power gave notice and held informational meetings in the affected counties regarding the route it had chosen. It then petitioned the Iowa State Commerce Commission for a franchise to construct the line on that route and for authority to condemn right of way. The commission held hearings on notice.

A substantial number of landowners appeared before the commission and objected to the diagonal route of the line across their farms. They testified to a number of difficulties that a diagonal line would cause. Mr. Schnoor testified about his proposed route. Mr. Tefft testified about his refinements to the Schnoor route and also that such route as thus refined is reasonable and practicable. He also opined that the Iowa Power route does not comply with § 489.18 of the Code, as it departs from land division lines although it is reasonable and practicable to follow them.

The commission granted Iowa Power's application for a franchise and authority to condemn and approved Iowa Power's proposed route in this language:

The applicant considered several alternate routes and the route as proposed is the most feasible, practical and reasonable route under the record before us. The alternate route proposed by objectors' witness Schnoor would require con-

struction on more farmland, and involve a greater number of farm owners. The alternate routes that were proposed to follow existing railroads would create much disruption of farming operations and create a greater cost of construction.

The landowners appealed to district court. Code 1973, § 490A.13. The trial court held that the commission's decision violated § 489.18 and found that the Schnoor-Tefft route is practicable and reasonable. The court reversed the decision and remanded the case to the commission for proceedings in conformity with its finding. The commission and Iowa Power thereupon appealed to this court. See § 490A.19.

■ Determinations of fact by the Iowa State Commerce Commission are final if supported by substantial evidence. Davenport Water Co. v. Iowa State. Commerce Comm'n, 190 N.W.2d 583 (Iowa). But determinations of law by the commission are open to re-examination by the courts. Code 1973, § 490A.17(1) ("not in accordance with law").

If we had only a dispute here between experts as to whether a transmission line following railroad or division lines is practicable and reasonable at certain points, we would have a different problem. But we have an entirely different case, one involving interpretation of § 489.18 of the Code. Statutory interpretation is a legal function and therefore within the province of the judicial department. 2 Am.Jur.2d Administrative Law § 656 at 517; 73 C.J.S. Public Administrative Bodies and Procedure § 231, at 602–603. We thus turn to an examination of § 489.18 in two respects: the "practicable and reasonable" clause and the "wherever" requirement. We then consider the appropriate disposition of the case.

■ I. *"Practicable and Reasonable."* In this case we do not affirmatively define the words "practicable and reasonable" but rather, we hold what they do not mean.

The extensive testimony of the engineers and other witnesses in the case reveals the opposing considerations involved in a statute such as § 489.18. That section was a part of a comprehensive enactment in 1913 which gave the railroad commission, as then known, authority to confer franchises and power of eminent domain upon individuals and corporations who desired to construct lines to transmit "electric currents." 35 G.A. ch. 174. The electric industry was then in its earlier years, and one of the basic policy issues facing the legislature related to the location of transmission lines. Transcending the interests of individual landowners whose farms would be traversed, the issue involved a policy for the whole state: whether to permit diagonal transmission lines throughout Iowa or to restrict lines to railroads and land division lines. The question facing the legislature was by no means open and shut.

Obviously the cheapest, simplest, and most convenient location for transmission lines would be directly from origin to terminus—which would mean diagonal lines in many cases. Such lines would ordinarily be shorter than railroad or land division routes, require less cable and fewer structures, involve interference with fewer landowners, come near fewer buildings, and avoid more changes of direction in lines.

If the legislature required adherence to railroad and land division lines, the electric industry (and therefore its customers) would often have the additional expense involved in longer lines, more cable and structures, proximity to more buildings, more changes of direction in lines, and interference with more landowners. These are built-in, unavoidable added costs of such a system. But such is the system the legislature chose, to be used wherever practicable and reasonable.

Clearly the legislature did not mean that the additional burdens which ordinarily attend railroad and land division routes, as contrasted to diagonal lines, make those routes impracticable and unreasonable. Those additional burdens inhere in the railroad and land division system. If those

burdens made the railroad and land division system impracticable or unreasonable, then few if any situations would exist in which such system would prevail over diagonal lines and the statute would be an almost empty letter.

Iowa Power did not grasp the meaning of § 489.18. It measured the burdens of the diagonal line against the railroad and land division routes, and to the surprise of no one found the diagonal line less burdensome. But the burdens in the railroad and land division routes which Iowa Power discovered were only those which normally attend such routes. If such burdens would permit a diagonal line in this case, the state would be opened to diagonal transmission lines generally and § 489.18 would be largely gone. The question is not simply whether a diagonal line is more practicable or reasonable than a railroad or land division route, as Iowa Power would decide the issue. Rather, the question is whether the utility has shown that at given points, departure from the railroad or land division route is permissible because adherence to such a route would be impracticable or unreasonable at those places.

■ The commission adopted Iowa Power's rationale and fell into the same error. Indeed, under a proper interpretation of the statute, the record does not contain substantial evidence that a practicable and reasonable route along railroads or land division lines does not exist.

■ II. *"Wherever."* Not only did Iowa Power misinterpret the "practicable and reasonable" clause, its diagonal route also violated the "wherever" requirement of § 489.18. That requirement means that a utility must start its planning with railroad or land division routes. If such routes contain points of impracticability or unreasonableness, the utility may deviate from the route at those points. The transmission line must follow a railroad or land division route "wherever" practicable and reasonable.

■ Iowa Power's diagonal route constitutes a wholesale departure from railroad and land division routes and violates the "wherever" requirement.

■ III. *Disposition.* The trial court properly vacated the commission's decision. Code 1973, § 490A.17. But the court found as a fact that the Schnoor-Tefft route conforms to § 489.18 and remanded the case to the commission for proceedings in conformity with the court's finding. This disposition of the case constituted error for two reasons. First, appeals from the commission to district court are not de novo; the commission is the fact finder. Code 1973, § 490A.17; Davenport Water Co. v. Iowa State Commerce Comm'n, 190 N.W.2d 583 (Iowa). Moreover, as part of its function the commission and not the courts determines the route in the light of the facts found by the commission. § 489.4. Cf. Tebbs v. Denmark Light & Telephone Corp., 230 Iowa 1173, 300 N.W. 328 (comparable situation with industrial commissioner).

Second, more proceedings than only another fact finding and route determination will be necessary. As the statute now stands, the utility must hold informational meetings upon notice to affected landowners before it petitions the commission. Code 1973, § 489.2 et seq. Iowa Power will have to begin again as to the line between Lehigh and Sycamore, observing our interpretation of § 489.18 in the process.

We thus affirm the portion of the judgment vacating the commission's decision, reverse the remainder of the judgment, and remand the case to the commission for proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

All Justices concur except HARRIS, J., who takes no part.