William H. ANSTEY, James E. McLaren,
Stanford Pelzer, Clarence Schrier and
Martin Sullivan, Appellants,

v.

IOWA STATE COMMERCE
COMMISSION, Appellee,

Iowa Power and Light Company, Iowa-Illinois Gas and Electric Company, Cedar Falls Municipal Utilities, Atlantic Municipal Utilities, Central Iowa Power Cooperative, Inc., Eastern Iowa Light and Power Cooperative, Inc., and Corn Belt Power Cooperative, Inc., Intervenors and Cross-Appellants,

William C. Brandt, Gerald Forristal, Arthur John Chambers, C. Clint Goos, Herman Stortenbecker, Dorothy Stortenbecker, Leo Stortenbecker, Linda Stortenbecker, Mrs. Harold Chambers, Melvin Easton, Alva Tibbles, Elsie Strohbehn, Dean Wallace, Donald D. Goos, Barbara Goos, Gordon L. Enewold, Lynette Enewold, Carl G. Miller, Intervenors.

No. 63303.

Supreme Court of Iowa.

May 21, 1980.

W. Edward Anstey, Centerville, for appellants.

Harold T. Beckman of Smith, Peterson, Beckman & Wilson, Council Bluffs, for intervenors Brandt et al.

James R. Maret, Commerce Counsel, Daniel J. Fay and Diane L. McIntire, Asst. Commerce Counsel, Des Moines, for appellee.

B. A. Webster of Gamble, Riepe, Burt, Webster & Davis, Des Moines, for intervenor-cross-appellants Iowa Power and Light Co., Iowa-Illinois Gas and Electric Co., Cedar Falls Municipal Utilities, and Atlantic Municipal Utilities.

Keith D. Hartje, Des Moines, for intervenor-cross-appellant Iowa Power and Light Co.

Michael P. Joynt and John T. Ward of Wasker, Sullivan, Wheatcraft & Ward, Des Moines, for intervenor-cross-appellants Central Iowa Power Cooperative, Inc., Eastern Iowa Light and Power Cooperative, Inc. and Corn Belt Power Cooperative, Inc.

LARSON, Justice.

Landowners and others holding interests in land along the proposed route of an electric transmission line sought judicial review of an order by the Iowa State Commerce Commission which overruled their objections to the project and granted to Iowa Power and Light Company a franchise for the line and authorization to acquire easements by eminent domain. The district court affirmed the commission, and the objectors have appealed under section 17A.20, The Code, alleging various procedural and substantive infirmities in the administrative proceedings of the commission. Iowa Power has cross-appealed from that part of the district order which had reversed the commission's grant of a "perpetual" easement.

The issues raised are: (1) the sufficiency of the informational meetings and the notices in regard to them; (2) the effect of the commission's alleged failure to adopt procedural rules; (3) whether the commission ruling complied with the location and design requirements of section 478.18, The Code; (4) whether on de novo review, the commissioners should be disqualified and their proceedings voided on the basis of alleged bias and ex parte communications; and (5) whether the commission erred in granting authority to secure "perpetual" easements. We affirm the district court on all of the issues raised.

Iowa Power and other utility companies have constructed a large coal-fired generating station near Council Bluffs. In order to distribute this power, they proposed to build a 124 mile, 345,000-volt transmission line from the plant eastward to a substation at Booneville, near Des Moines. The objecting parties, primarily owners and tenants, claim a variety of interests in the land traversed by the proposed line. They assert failures on the part of the franchise applicant and the commerce commission to abide by chapter 478, The Code, governing the construction of electric transmission lines. Some of the issues presented on appeal are common to all of the objecting parties; some issues were presented by only some of them. For clarity we will not attempt to treat each party's issues separately in this opinion but will merely refer to them collectively as the objectors.

I. *Informational Meetings—Notice and Proceedings.*

Section 478.1 requires that, before such a transmission line may be constructed "along, over, or across any public highway or grounds outside of cities," a franchise must first be granted by the commerce commission. Before a petition for such a franchise may even be filed, "informational meetings" for affected parties are mandated by section 478.2. Informational meet-

ings were held in each of the counties involved, following mailed and published notice to affected parties. The objectors claim that these "informational" meetings were defective because the notice was insufficient and the conduct of the meetings themselves was so defective as to constitute a failure to satisfy the condition precedent to the filing of the petition.

Following the informational meetings, the petition for franchise was filed. Successive motions to dismiss the petitions were sustained, the first on the basis of improper notice of the franchise hearing (not the informational meetings) and the second on the basis of defects in the petition itself. These dismissals led to an earlier appeal to this court in *Richards v. Iowa State Commerce Commission*, 270 N.W.2d 616 (Iowa 1978). In that case we held the district court erred in entertaining judicial review of the agency action, which was intermediate agency action, when all administrative remedies had not been exhausted as required by section 17A.19, The Code. None of the issues dispositive in *Richards* are raised in this appeal.

The commission concluded that the notice requirements of the statute were complied with and there were no fatal defects in the conduct of the informational meetings. The district court held there was substantial evidence to support those findings.

A. *Scope of review.* These objectors contend that, because the informational meeting is a condition precedent to filing of a franchise petition, it is "jurisdictional" and the commission's order in regard to the sufficiency of the notice of the meetings and the conduct of the meeting itself is not subject to the "substantial evidence" standard under section 17A.19(8)(f), The Code, but is reviewable de novo. The objectors' argument for de novo review of "jurisdictional" facts is countered by the commission and Iowa Power, who argue that these findings are binding if supported by substantial evidence, just as other facts are. There is some support for the objectors' position. *Bidwell Coal v. Davidson*, 187 Iowa 809, 818–19, 174 N.W. 592, 595 (1919), involved a workers' compensation case. The commission had reviewed the evidence and determined that the petitioner had not been an employee of the coal company. It therefore ruled that it did not have jurisdiction to enter an award for the claimant. This court said:

It is true that, as to disputed facts which do not go to the jurisdiction, we are bound by the finding of the commissioner; but where the only question presented is whether or not the jurisdictional fact exists, entitling the person to be heard before the commissioner, we have a right to review the action of the commissioner, even to the extent of finding the fact to be other than the commissioner found it.

This case has not been uniformly followed, and, in fact, in *Taylor v. Horning*, 240 Iowa 888, 890, 38 N.W.2d 105, 107 (1949), this court said "[u]nless it can be said as a matter of law from the record here that claimant was an employee and not an independent contractor at the time of his injury there is no ground for interfering with the commissioner's decision." In a recent case, we reviewed a determination by the Public Employee Relations Board that certain fire department personnel were not supervisory employees and were therefore to be included in the bargaining unit. We said our review of the PER Board bargaining unit determination was at law, not de novo. *City of Davenport v. Public Employment Relations Board*, 264 N.W.2d 307, 311 (Iowa 1978). While not directly on point with the issue here, that case involved a threshold status determination in review of agency action which is akin to "jurisdiction," and we find it persuasive in this case. One writer has observed that only when a statute provides for de novo review, or provides for review of reasonableness of administrative decisions, or is silent as to a standard of review will such review be de novo. Bezanson, *Judicial Review of Administrative Action in Iowa*, 21 Drake L.Rev. 1, 45 (1971).

Our Administrative Procedure Act provides for judicial review if the petitioner has been prejudiced and if the agency ac-

tion, "[i]n a contested case, [is] unsupported by substantial evidence in the record made before the agency when that record is viewed as a whole . . . ." § 17A.19(8)(f), The Code. No distinction is made under the APA between "jurisdictional" and "non-jurisdictional" facts in applying a standard of review, and we find no justification for such distinction. The legislature showed it was mindful of the options it had with regard to scope of review because it provided for de novo review on issues of claimed agency bias. See § 17A.17(4). Under the doctrine of *expressio unius est exclusio alterius*, we must conclude its failure to provide for de novo review was intentional. One writer has said that "[q]uestions of jurisdictional fact, as well [as other facts], are subject to the substantial evidence test." Bezanson, *supra*, at 45.

*Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), relied upon by the objectors, is considered to be the seminal case on the "jurisdictional fact" concept. This concept seems to have been born out of concern that some outside person or agency would exercise too great a control of access to the courts if their findings of jurisdiction were not reviewable de novo. *Crowell*, 285 U.S. at 54–57, 52 S.Ct. at 293–95, 76 L.Ed. at 614–16. The rule of the case and its progeny, however, has fallen on hard times of late, and its present use has been widely criticized. *See, e. g.*, 4 K. Davis, *Administrative Law Treatise* § 29.08, at 161–63 (1958); Jaffe, *Judicial Review: Constitutional and Jurisdictional Fact*, 70 Harv.L. Rev. 953, 965 (1970). Presently only a few states recognize the doctrine. Davis, *supra*, at 163.

Some observations of the "jurisdictional fact" concept should be made: (1) it does not appear to be contemplated by our legislature in enacting the "substantial evidence" standard for reviews under the APA, except on matters of alleged agency bias; (2) the rule is presently a minority rule and continuing to lose ground; and (3) the rational of the rule, that we must not, in effect, abrogate our responsibility of determining court access, lacks present appeal. Agency findings on substantive issues are given the benefit of the substantial evidence rule; it makes sense that the agency should also have this presumption in deciding the intermingled issues of fact necessary to jurisdiction. This raises another pragmatic consideration: It is difficult in some instances, including the instant case, to sort out "jurisdictional" from "non-jurisdictional" facts. Repudiation of a dual standard of review eliminates this problem.

We therefore reject the view that a court on judicial review of agency action may examine "jurisdictional" issues or any other issues except bias of agency personnel under a de novo standard. All such matters are to be deemed established unless unsupported by substantial evidence in the agency record, as provided in section 17A.19(8)(f), The Code.

With this standard of review in mind, we examine the record to find whether any substantial evidence existed to support the commission's findings of fact as to the sufficiency of the notice of the informational meetings and of the conduct of the informational meetings themselves.

B. *Notice of the informational meetings.* As to the sufficiency of the notice of the meetings, the facts are largely undisputed. The company sent out nearly 1200 notices of the informational meetings. It compiled a list of names by referring to the plat books in the county auditors' offices, transfer books, title changes as recorded in the auditors' offices, as well as "miscellaneous" and mortgage indexes. It also contacted local grain elevator operators to determine the existence and identity of any farm tenants on the affected property. The company sent notices to everyone whose names it was able to find and whose residences were known. Despite these efforts, the objectors presented several witnesses at the commission hearings who had not received notice of the informational meetings. Two witnesses were landowners whose notices were sent to the wrong address, one was a landowner whose residence was unknown, and most others did not have recorded interests

in the land. These objectors say these notice defects deprived the commission of jurisdiction, because informational meetings, with sufficient notice, are conditions precedent to filing of the petition for franchise under section 478.2, The Code. That section requires that, not less than thirty days prior to the filing of the franchise application, informational meetings shall be held in each county in which affected real estate is situated, in "a location reasonably accessible" to all parties affected by the granting of the franchise. Notice of the meeting is to be given to "each person, company or corporation determined to be a *landowner* affected by the proposed project *and* any person, company or corporation *in possession of or residing on* the property." § 478.2 (Emphasis added.) A "landowner" is defined as the party shown by the tax assessment rolls to be liable for payment of the real estate taxes on the property. The notice is required to give general information about the project and the rights of affected persons. Section 478.2 also provides that the notice shall be served at least thirty days before the meeting by certified mail with return receipt requested and published once in a newspaper of general circulation. It then provides that "such publication shall be considered notice to *landowners* whose residence is not known." (Emphasis added.)

The objectors argue that strict compliance with the notice of informational meetings is required and that failure to notify any landowner whose residence is known or to notify by certified letter any possessor and any resident, whether or not their residences are known, results in denying the commission jurisdiction over the franchise petition. The commission argues that the notice requirements are fulfilled so long as there is good faith, substantial compliance with the provisions. They argue that the conditions precedent to the franchise petition were the holding of informational meetings and not the sending of notice to all affected persons.

The utility and commission contend that publication of notice was sufficient to cure any defect in the mailed notice, despite the fact the omitted parties were not "landowners." The objectors urge a literal interpretation of that term and argue that publication will not cure an omission of mailed notice to tenants or other persons with less than actual ownership. We conclude that the statute should be interpreted to include all those parties listed in the statute to whom such notices must be mailed, which includes parties "in possession of or residing on" the property.

To interpret the saving provision regarding publication in the manner urged by the objectors would mean that mailed notice to non-owners would be required even if their existence was neither known nor ascertainable by diligent search. Our view seems to be consistent with the legislative history of the act. The statute as originally presented to the legislature spoke only in terms of landowners. However, during the legislative process the first reference to landowners was amended to include possessors and residents. Several other references to landowners in the provisions were not so amended. In light of this legislative history, the commission ruled that the later references to landowners were generic so that those references included not only landowners but also possessors and residents. We concur in that interpretation. Therefore, publication of notice of the informational meetings is sufficient notice to affected parties, even if they are not "landowners" as defined in the statute, if their identity or address is unknown following a reasonably diligent search for such information.

Further, the objectors here can show no prejudice resulting from the failure to notify all interested parties; none of them signed an easement, and these proceedings attest to the fact that they have fully availed themselves of all of the legal procedures which the statute says they should be informed of at such meetings, and a considerable number of others besides.

Substantial compliance with the notice requirements of the statute is shown. Where as here there is a good faith effort to comply and no prejudice is shown, substantial compliance is sufficient. We con-

clude that the mailed notices of informational meetings were sufficient as to those parties whose addresses were known; publication of notice was sufficient, under section 478.2, for those affected parties whose addresses were not known.

■ C. *Conduct of Informational Meetings.* The statutory requirements for the informational meeting are brief. Section 478.2 provides, in part, that:

> As conditions precedent to the filing of a petition with the commission requesting a franchise for a new transmission line, and not less than thirty days prior to the filing of such petition, the person, company, or corporation shall hold informational meetings in each county in which real property or rights therein will be affected. A member of the commission, the counsel of the commission, or a hearing examiner designated by the commission shall serve as the presiding officer at each meeting and present an agenda for such meeting which shall include a summary of the legal rights of the affected landowners. No formal record of the meeting shall be required.

No claim is made that the express statutory requirements were not satisfied; however, the objectors argue that the meetings were conducted so poorly that they did not fulfill the informative role envisioned by the legislature. There was conflicting testimony about the sufficiency of the capacity of the meeting rooms, the acoustics and the conduct of the meetings themselves. The commission made several specific findings involving the conduct of the meetings. To the allegation that there was insufficient seating capacity, it found that there was no evidence that better locations were available or that anyone was prejudiced. To the allegation that people were unable to hear, the commission found that their employee's testimony was more credible, and he had testified that people could hear. As to the allegation that people were restricted in the number of questions that they could ask, the commission ruled that that was proper. Because of the number of people at the meeting, the presiding officer had limited

each to a single question until everyone had had an opportunity to ask questions. The commission concluded that that was a reasonable way to conduct a meeting. To the allegation that the summary of rights read at the meeting was insufficient, it ruled that those read were the most important and fulfilled the informative function. All of these findings are supported by substantial evidence. An issue of law is also raised by the objectors who claim that the summary of rights read was insufficient because it did not adequately advise objectors now to most efficaciously oppose the project or advise them that the Iowa APA procedures would be involved, that the company would be seeking a permanent easement or that objectors would have the right to discovery. The commission argues that it is not the role of the informational meetings to provide detailed legal counsel to objectors and that these omissions do not detract from the validity of the meetings. We agree.

II. *Procedural Rules.*

■ Section 17A.3(1)(b), The Code, provides that each agency shall:

> Adopt rules of practice setting forth the nature and requirements of all formal and informal procedures available to the public, including a description of all forms and instructions that are to be used by the public in dealing with the agency.

These objectors argue that the commission failed to adopt procedural rules for the informational meetings and the franchise hearing and that the commission was thereby deprived of jurisdiction to proceed. They also claim they were prejudiced in submitting their resistance by the failure to adopt rules. As to the claim of prejudice, the commission found none had been established, pointing out that "objectors have managed to get two sets of hearings and now three orders on jurisdictional issues and were successful in getting one petition dismissed. This history discloses the very antithesis of prejudice." There is substantial evidence in the record to support that conclusion. In addition, we conclude the commission did have procedural rules before the effective date of the IAPA, Chapter

17A. The commission repromulgated its existing procedural rules after the effective date of the IAPA, in effect adopting the rules of civil procedure. The objectors claim that the rules were inadequate because they did not, as of the time of the informational meetings, provide rules for their conduct, including one to advise objectors they would be confronted by lawyers advocating an opposing view and because forms for objections should be provided in the rules. The commission contends that the fact that a "suggested" objection form was adopted after these informational meetings should not be interpreted as any indication that it was necessary. Its use is optional, and, in fact, use of forms has not been encouraged because the commission has sought to maintain informality in the proceedings. In summary, these are rules which might be appropriate and helpful, but failure of the commission to adopt such rules does not amount to a rulemaking omission so substantial as to void the proceedings.

III. *Compliance with Location and Design Requirements under Section 478.18, The Code.*

■ The objectors complain that the franchise approved by the commission, because of its location and design, would unreasonably encroach upon their land. They rely upon section 478.18, which provides that the transmission line

> shall be constructed near and parallel to the *right of way of the railways of the state or along the division lines* of the lands, according to the government survey thereof, wherever the same is practicable and reasonable, and so as not to interfere with the use by the public of the highways or streams of the state, *nor unnecessarily interfere with the use of the lands by the occupant thereof.* (Emphasis added.)

The objectors contend that the commission failed to abide by its duty under this section to make certain the line did not "unnecessarily interfere" with the use of the land. They argue that it failed to do this in several particulars: its allowance of a 125-

foot clearance from structures rather than the 100-foot statutorily required clearance constitutes a "wholesale departure from land division line routing"; that a 345 KV line is more intrusive than is required under these circumstances and that a 230 KV line would suffice; that the use of double-pole construction is more intrusive on land use and the commission should require a single-pole construction; that the commission's consideration in rejecting a proposed alternative route was the increased cost of construction and that this was improper under our cases; that the width of right-of-way granted is too great and could be reduced by a requirement of single-pole construction; that this route is improper because it had 27 or 28 digressions from railroad and division line routing, which was more than would be required by other alternative routes; and that it failed to give the required preference for an existing railroad right-of-way for the line's location.

The objectors contend that we should not give deference here to the judgment of the commerce commission, despite their presumed expertise in the area, because the interpretation and application of a statute is involved, and that is solely the duty of the courts.

Our interpretation of section 478.18 must begin with a consideration of *Hanson v. Iowa State Commerce Commission,* 227 N.W.2d 157 (Iowa 1975). In *Hanson,* the commerce commission had approved the utility's application for a franchise for a route which in part crossed sections diagonally. It said this route was more "feasible, practical and reasonable" than the other alternatives. The commission found the other routes would "require construction on more farmland and involve a greater number of farm owners." The alternative routes, following railroads, "would create much disruption of farming operations and create a greater cost of construction," according to the commission ruling. Upon appeal to this court, we said:

> [i]f we had only a dispute here between experts as to whether a transmission line following railroad or division lines is prac-

ticable and reasonable at certain points, we would have a different problem. But we have an entirely different case, one involving interpretation of § 489.18 of The Code. Statutory interpretation is a legal function and therefore within the province of the judicial department.

The court held that additional "burdens" which had been enumerated by the commission did not make the alternative which would have followed railroad and division lines "impracticable and unreasonable" so as to permit construction along other alternative routes as provided by section 478.18. As we pointed out in that case, this was a matter of statutory construction—not the exercise of expert judgment on the issue of what digressions from rail and section lines could be permitted. We said that "[i]n this case we do not affirmatively define the words 'practicable and reasonable' but rather, we hold what they do not mean." *Hanson*, 227 N.W.2d at 162.

The instant case clearly presents that "different problem" which *Hanson* indicates is a province of the experts—not the judiciary. In *Hanson*, the reasons given were insufficient as a matter of law. The utility, and the commission, erred in the application of section 478.18 because they had "measured the burdens of the diagonal line against the railroad and land division routes, and to the surprise of no one, found the diagonal lines less burdensome. But [these burdens] . . . were only those which normally attend such routes."

Applying section 478.18 in this case, in the light of *Hanson* we conclude that the deviations section lines were based upon engineering considerations of practicability and reasonableness. The plan began with division line locations and adhered to them except when, in the judgment of engineers, it was not practicable or reasonable to do so. It was not the sort of "wholesale departure" from railroad and section lines found in the diagonal line disapproved in the *Hanson* case. The engineering reasons given for the deviations in this case need not be set out in detail; neither section 478.18 nor *Hanson* requires us to determine as a matter of law that the alternative with the fewest deviations should be approved, as objectors suggest Nor are we required, or permitted, to exercise our independent judgment as to whether the reasons of practicability and reasonableness are correct.

The commission, after hearing the evidence in support of and opposition to the line as proposed, ruled against the objectors on all of the matters of location and design raised by them. The commission found, for example, that the additional 25-foot clearance was required in order to "insure in practice" the statutory clearance of 100 feet; that a 230-KV line would be insufficient to meet consumer needs; that single-pole construction would actually result in greater land-use disruption, less safety and less reliability (The decrease in land-use disruption by double-pole construction results from the fact that they can be spaced in quarter-mile intervals; in most instances they can be placed along cross fences.); that the proposed route would result in less total land-use disruption than any of the alternatives; that increased cost in the reconstruction of the existing Avoca line and considerations of reliability rendered that alternative nonviable; that the Rock Island right-of-way route was not a viable alternative because of aesthetic, land-use disruption and safety considerations; and that the *number* of digressions is not paramount in importance over the amount of land-use disruption. We cannot find that any of these findings are unreasonable. While increased cost is not a proper consideration as between a direct route and routing along railroads or division lines, there is no reason to conclude that it is an improper consideration as between two conforming routes. Similarly, emphasizing total land-use disruption over the number of route digressions would seem to more completely effectuate the legislative mandate of section 478.18. Nor are the digressions along the proposed route unreasonable. Many of the digressions from land division routings were in response to landowners' requests, some digressions were necessary to change from one section line to another and one was to leave a division line to parallel a railroad.

Approximately eleven days of hearings were conducted by the Commission, and a great amount of engineering testimony was received on the issues of design and location of the proposed line.

In *Merchant v. SMB Stage Lines*, 172 N.W.2d 804, 807 (Iowa 1969), this court said, in a review of an industrial commissioner's order, that

[t]he commissioner's findings of fact have the effect of a jury verdict and, where the evidence is in dispute or where reasonable minds may differ on inferences fairly to be drawn from the disclosed facts, the commissioner's findings of fact are conclusive on appeal.

We have examined the record and find that substantial evidence supports the commission in its conclusion that the deviations approved were based upon engineering considerations of practicability and reasonableness which pass muster under *Hanson* and section 478.18. Substantial evidence also supports its conclusions with regard to the other details of design and construction in issue here. The evidence was obviously conflicting, but under section 17A.19(8)(f) we need only to determine whether there was substantial evidence in the record made before the commission when that record is viewed as a whole. We conclude that there was. We need not attempt to decide whether their decision was right; that is an engineering issue, not a legal one.

IV. *Allegations of Bias.*

Some of the objectors claim the commission and its chairman, Maurice Van Nostrand, were so biased that they were effectively denied a fair hearing, and thus deprived of constitutional and statutory rights, requiring reversal of the agency action under section 17A.19(8). They claimed Van Nostrand's bias stemmed from a conflict of interests caused by his position as a member of the Iowa Energy Policy Council and several comments made by him, both at the franchise hearing and at an Energy Council meeting. Their assertion that being a member of the Energy Policy Council creates a conflict of interests reads too much into the statute creating the council.

Section 93.7(12), The Code, provides that one of the duties of the council is to "examine and determine whether additional state regulatory authority is necessary to protect the public interests and to promote the effective development, utilization and conservation of energy resources. . . ." The objectors take the last part of that section out of context and argue that Van Nostrand has a duty to promote the development of electric utility lines and that that duty is inconsistent with being an independent decision maker on whether or not this particular utility line is necessary. However, that is not the way in which we read the code section; it says that the Energy Policy Council is to determine whether additional state regulatory authority is necessary to promote the development of utilities. We do not believe the legislature intended to place the commissioner in two positions which have built-in conflicts of interest. See § 4.6(5), The Code (consequences of particular construction to be considered in statutory interpretation).

Another ground for asserting personal bias of Van Nostrand is a statement which he made at the franchise hearing. He spoke to several of the objectors and advised them that electrical consumption has to be satisfied and that they should keep the lines of communication with the power companies open in the hope of being able to influence the placement of poles on their property. The objectors argue that this shows that the chairman had a closed mind as to whether or not he would grant this particular franchise. The objectors also point out several comments made by Van Nostrand at an Energy Policy Council meeting. He said that most objectors are merely interested in having transmission lines cross other peoples' property, that few of the objections are good objections and that most of the objectors are more interested in their financial interest and advocated that the Energy Policy Council "drum up support for the utilities' position."

The objectors do not point to any personal bias of the other commission members, but argue that the commission's rulings

during the course of the hearing evidenced such a personal bias. These objectors say that

[w]hile the remaining members of the Commission were not as loquacious as their chairman in demonstrating personal bias and pre-judgment of the issues in this cause, it is [objectors'] contention that a review of the entire record in this matter leads to the inescapable conclusion that the entire Commission should have been disqualified for personal interest in these particular proceedings. The core of this contention is that it was the Commission's failure to perform its duties pursuant to chapter 17A of the Code which is principally responsible for what has been characterized as a procedural nightmare.

An agency ruling on allegations of bias of an agency member is reviewed de novo, § 17A.17(4), The Code, and we have examined the record of these proceedings under that standard. The burden of showing reversible bias is upon the objectors, because there is a rebuttable presumption of regularity attending official acts of the commission. *Cedar Rapids Steel Transportation, Inc. v. Iowa State Commerce Commission*, 160 N.W.2d 825, 836 (Iowa 1968) (evidence of alleged bias held to be insufficient to rebut presumption).

The objectors have set forth no standards by which to assess their allegations of claimed bias. At the outset, we find nothing in the record to show disqualifying bias of the non-presiding members of the commission. The objectors rely merely upon their "failure to perform [their] duties" under ch. 17A, thereby causing a "procedural nightmare." Allegations of the commissioners' disregard of the statute might be a basis for reversal on the merits on judicial review of the agency action under section 17A.19. Such violations may also be evidence of bias, which together with other facts, may be sufficient to rebut the presumption of regularity of the proceedings. However, standing alone they are palpably insufficient to rebut the presumption of regularity of the proceedings of the commission.

The activities of Chairman Van Nostrand present a closer question. We have already determined that his statutory position on the Iowa Energy Policy Council did not automatically disqualify him; now we must decide if any of his activities did. Canon 2 of the Code of Judicial Conduct provides that "[a] judge should avoid impropriety and the *appearance* of impropriety in all his activities." (Emphasis added.) We believe that agency personnel charged with making decisions of great import, as in this case, should be guided by the rationale of that canon. However, while we do not approve the gratuitous statements attributed to him, we do not believe the remarks of Van Nostrand were of such a nature as to require his disqualification. In *Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 96 S.Ct. 2308, 49 L.Ed.2d 1 (1976), the Supreme Court said that taking a position, even in public, on a policy issue related to the dispute does not disqualify a decision maker. In order to disqualify him, it must be shown "that he is not capable of judging a particular controversy fairly on the basis of its own circumstances." 426 U.S. at 493, 96 S.Ct. at 2314, 49 L.Ed.2d at 9 (quoting *United States v. Morgan*, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429, 1435 (1941)). We said in *Cedar Rapids Steel*, moreover, that alleged bias becomes a justiciable issue only as it bears on the fairness of the hearing. "It cannot be imputed to the fact-trier retroactively, as it were, because his mind has absorbed the impressions left by a full and fair hearing." 160 N.W.2d at 837 (quoting *A. O. Smith Corporation v. National Labor Relations Board*, 343 F.2d 103, 110 (7th Cir. 1965)). Van Nostrand's statements at the Energy Policy Council that few objections are good, that most objectors are motivated by financial considerations and that most objectors merely want the lines to cross other peoples' property, while they might be interpreted as leaning toward the general view that electrical transmission franchises should be extended, are not shown to be directly referable to this particular line or to the objections to it.

This presents a factual context clearly distinguishable from *Texaco, Inc. v. F. T. C.*, 336 F.2d 754 (D.C. Cir. 1964), relied upon by the objectors. In *Texaco*, the chairman of the commission indicated in a speech made during the pendency of a matter then before the commission what the outcome was going to be.

As to the statement by Van Nostrand that the parties should keep the lines of communication open, the objectors have not shown this was anything other than what it appeared to be on its face—an effort to insert a conciliatory note in a hotly contested and emotional matter.

Upon our de novo review of the record before the commission, we find no basis for disqualification of the chairman or of the other members of the commission on the grounds of bias.

Along a similar line, some objectors complain that Chairman Van Nostrand violated the specific terms of section 17A.17(2) because of ex parte communications he had with employees of the petitioning utility. That section provides in part:

> Unless required for the disposition of ex parte matters specifically authorized by statute, parties or their representatives in a contested case shall not communicate, directly or indirectly, in connection with any issue of fact or law in that contested case, with individuals assigned to render a proposed or final decision or to make findings of fact and conclusions of law in that contested case, except upon notice and opportunity for all parties to participate as shall be provided for by agency rules.

The ex parte communications complained of occurred after the commission had dismissed the franchise petition. On both occasions the power company officials called Van Nostrand to discuss the reasons for the dismissal. There is no evidence that there was input from those officials which could influence a matter then pending or which would go to the merits of their petitions once they were refiled. Therefore, the parties and commission chairman were not shown to have violated the letter of the

statute. However, there are means available under our procedural rules for parties to request more specific findings and conclusions in such a manner as to inform opposing parties of their actions and avoid the appearance of impropriety almost certain to attend any one-sided discussion of matters in controversy. Our view of this matter is similar to that concerning the allegations of bias: while we do not approve of such conversations, we do not believe they require reversal.

### V. *Duration of Easements.*

The last issue concerns the maximum allowable term of easements granted by the commission. The sheriffs' juries in the compensation commission hearings were instructed to compute damages on the basis that the easements were "perpetual," and this is presumably what they did. No one claims, at any rate, that he was paid for anything less than that. The commission originally ruled they were to be "perpetual," and the objectors say this was beyond its authority. The district court on review did not treat the issue in its original order but, in response to a motion for expanded findings and conclusions, entered an order which modified the commission ruling insofar as it granted a "perpetual" easement. The court held that the easement could not initially extend beyond the 25-year franchise period, but "in the event a franchise is extended . . . the easement therefor would correspondingly be extended." The objectors claim that can be no automatic extension of the easement. Iowa Power, as franchisee, is also concerned about the effect of that part of the ruling which says that the

> power of condemnation . . . must coincide and be commensurate with the franchise or privilege granted for such purpose not to exceed twenty-five years . . . . The Iowa legislature has not given to the [commission] . . . authority to grant a perpetual easement to the power companies when [the] franchise or privilege for such purpose shall not be longer than a period of twenty-five years.

Iowa Power therefore has "taken a cross-appeal from this ruling only in the event that Judge Hayden's sentence [just quoted] . . . is construed to mean that the easement is limited to 25 years."

Section 478.15 grants eminent domain powers to a party which has been granted a franchise for construction of an electric transmission line, providing in part that

any person, company, or corporation having secured a franchise as provided in this chapter, shall thereupon be vested with the right of eminent domain *to such extent as the commission may approve, prescribe and find to be necessary for public use* . . . . (Emphasis added.)

This section appears to give the commission broad latitude as to the terms of the easement, but it is silent on the question of how long such easements may last. It is clear that the *franchise* may not be granted for more than 25 years. § 478.9, The Code. May the accompanying *easements* be ordered in perpetuity in review of that limitation? We conclude the easements are neither perpetual nor do they terminate with the franchise. Rather they are effective for so long as the electric transmission line remains in use on the property. We are led to that conclusion by a reading of the statute and consideration of analogous cases decided by this court.

The time-limitation and extension provisions of chapter 478 refer to the franchise, not the accompanying easement. *See, e. g.*, § 478.90 (25-year limitation on franchise); § 478.13 (extension of franchise). On the other hand, the chapter provides that the interest in the land itself will revert upon abandonment or nonuse. Part of section 478.15 provides:

If an electric transmission line right-of-way, or any part thereof, is wholly abandoned for public utility purposes by the relocation of the transmission lines, is not used or operated for a period of five years, or if its construction has been commenced and work has ceased and has not in good faith been resumed for five years, the right-of-way shall revert to the person or persons who, at the time of the abandonment or reversion, are the owners of the tract from which such right-of-way was taken. [procedure for implementing reversion provisions follows.]

An analogous case is *Henry v. Dubuque and Pacific Railroad*, 2 Iowa 288, 301 (1855), which involved the measure of damages in an appropriation for railroad purposes. The court said, in dictum, that despite the fifty-year limit on corporate charters, and therefore upon the duration of licenses for railroads, the interest in land "would be in perpetuity if the grantees, or assigns continue to occupy the land for the purposes for which it was appropriated." *Accord, Heskett v. Wabash, St. Louis & Pacific Railway Co.*, 61 Iowa 467, 469, 16 N.W. 525 (1883).

We conclude that the easements obtained pursuant to the franchise procedures of chapter 478 shall remain in effect for so long as the land subject to the easement has not been abandoned and is being used for the purposes for which the franchise was granted. Upon abandonment or nonuse, it is subject to reversion under that part of section 478.15 just quoted.

Of course, if a franchise expires and the utility ceases to operate the line, the easement would be lost—not because it was coterminous with the franchise but because it would no longer be used for the intended purpose. This conclusion is in accord with the general law of easements stated at 25 Am.Jur.2d *Easements and Licenses* § 106, at 510–11 (1966):

An easement may be terminated by completion of the purpose for which it was granted, since the reason for, and necessity of, the servitude are at an end. Thus, if an easement is granted for a particular purpose only, the right continues while the dominant tenement is used for that purpose, but ceases when the specified purpose ceases.

Iowa Power, cross-appellant on this issue, concedes it is not entitled to have "perpetual" easements, but only easements which are coterminous with the use of the line. The commission agrees that its use of the

term "perpetual" in its order should be so qualified. While the ruling of the district court is not entirely clear, we believe it is in accord with our view that the easements do not terminate with a franchise and will continue to be in force subject to termination for abandonment or nonuse. We conclude, therefore, that no error by the trial court is shown.

We have considered all of the remaining issues raised in the many pages of briefs and voluminous record and find no basis for reversal. The case is therefore affirmed.

AFFIRMED.

All Justices concur except REYNOLDSON, C. J., who takes no part.