**In the Interest of D.C.V. and R.P., Minor Children,**

**Iowa Department of Human Services, Appellant.**

No. 96–1627.

Supreme Court of Iowa.

Sept. 17, 1997.

Thomas J. Miller, Attorney General, and Charles K. Phillips, Assistant Attorney General, for appellant.

Mike Bandstra, Des Moines, for appellee D.C.V.

J. Michael Mayer, Des Moines, for appellee R.P.

Considered by McGIVERIN, C.J., and HARRIS, LARSON, LAVORATO, and SNELL, JJ.

LAVORATO, Justice.

The juvenile court ordered the immediate placement of two juveniles in group foster care. The Iowa Department of Human Services (department) appeals from that decision on two grounds. First, the department contends the juvenile court improperly allowed testimony from a department official regarding budgeting decisions within the discretion of the department, the governor, and the legislature. Second, the department contends the juvenile court erred in overriding the fiscal constraints of the local regional group foster care plan when it ordered the placements rather than ordering the implementation of a new plan.

As to the first issue, the juvenile court did not rely on the challenged testimony in reaching its decision to order immediate placement of the two juveniles in group foster care. For that reason the department suffered no prejudice from the admission of the testimony. As to the second issue, we conclude the juvenile court committed no error because under separation-of-powers principles the court was not required to order a group foster care plan. The legislative delegation of power to the juvenile court and the department to devise such a plan was unlawful. The reason the delegation of such power was unlawful was because the legislature provided no procedural safeguards or substantive guidelines to determine individual group home placements. We therefore affirm.

I. *Background Facts and Proceedings.*

A. *The "Gateway Committee."* In 1992 the legislature enacted the "Regional Group Foster Care Target." 1992 Iowa Acts ch. 1229, § 10 (codified at Iowa Code § 232.143 (1993)). This provision provides:

1. A statewide target for the average number of children in group foster care placements on any day of a fiscal year, which placements are a charge upon or are paid for by the state, shall be established annually by the general assembly. The [Iowa Department of Human Services] and judicial department shall jointly develop a formula for allocating a portion of the statewide target established by the general assembly to each of the [Iowa Department of Human Services'] regions. The formula shall be based upon the region's proportion of the state population of children and of the statewide number of children placed in group foster care in the previous five completed fiscal years. The number determined in accordance with the formula shall be the group foster care placement target for that region.

2. For each of the [Iowa Department of Human Services'] regions, representatives appointed by the department and the juvenile court shall establish a plan for containing the number of children placed in group foster care ordered by the court within the target allocated to that region pursuant to subsection 1. The plan shall include monthly targets and strategies for developing alternatives to group foster care placements in order to contain expenditures for services provided to children within the amount appropriated by the general assembly for that purpose. Each regional plan shall be established in advance of the fiscal year to which the re-

gional plan applies. To the extent possible, the department and the juvenile court shall coordinate the planning required under this subsection with planning for services paid under section 232.141, subsection 4. The [Iowa Department of Human Services] regional administrator shall communicate regularly, as specified in the regional plan, with the juvenile courts within that region concerning the current status of the regional plan's implementation.

3. State payment for group foster care placements shall be limited to those placements which are in accordance with the regional plans developed pursuant to subsection 2.

Iowa Code § 232.143 (1993).

A committee was informally organized to implement section 232.143 for the Des Moines area region. The committee is called the Gateway Committee. The Gateway Committee is made up of representatives from the Polk County Department of Social Services, the juvenile probation staff, the Heartland Area Education Agency, the Des Moines school system, and the Iowa Department of Human Services.

Apparently, the committee has three functions: (1) to establish a yearly plan for group foster care cost containment, (2) to approve juveniles for group foster care placement eligibility, and (3) to approve the actual placement of juveniles in group foster care.

The yearly plan adopted by the committee for 1996 took the money allocated for the Des Moines region and divided it into the average daily cost for group care. This calculation gave the committee the number of group care placements it could afford and remain within its yearly budget. There were approximately 230 spaces for the region in 1996. The committee then allocated 123 spaces for Polk County. There is no written record of this plan in evidence. There is also no record evidence about the initial approval of juveniles for group foster care.

As mentioned, one of the committee's functions is to approve the actual placing of juveniles in group foster care. The record reflects the following facts regarding this function. First, beyond the initial approval, juveniles must be authorized for *actual* placement. Second, some juveniles, even though authorized, are not actually placed in foster care. Third, juveniles not placed in foster care were and are placed on a "prioritized waiting list." Fourth, there were approximately thirty-seven Polk County juveniles on this list at the times relevant to this appeal. Last, juveniles would be put on this list and would remain without group foster care placement despite their status as court-ordered group foster care placements.

The priority list is operated without notice to the juvenile, the juvenile's attorney or guardians, or the juvenile court. There are no written specific criteria for determining ranking for priority purposes. The committee makes no request for information from interested parties to determine such ranking. Nor does the committee hold formal hearings to determine the ranking.

*B. Meyer Hall.* Meyer Hall is a detention facility in Polk County. It has twenty beds. The average stay for a juvenile in Meyer Hall is two weeks.

Meyer Hall provides food, clothing, medical care, and education. There is one social worker on staff. There are no full-time psychologists or psychiatrists on staff. No regular therapy of any kind is offered for the juveniles. Occasionally, the department provides therapy, but this does not happen often.

Meyer Hall is a locked facility. The juveniles are locked in their rooms at night. They can move within the facility at all other times, but are only allowed outdoors one to two hours per day. The juveniles may not leave the facility at any time except for court appearances. There are bars on the windows and all family visits are monitored. The juveniles receive one seven-minute phone call per day to family.

Approximately one-quarter to one-third of Meyer Hall detainees are awaiting group care placement. The on-staff social worker from Meyer Hall describes it as "crowded" and optimally a short-term placement. The social worker also testified that the detainees are not segregated according to their reasons for detention. For example, juveniles de-

tained for such severe acts as murder or rape would be mingling with juveniles detained for minor infractions. The social worker further testified that children suffer emotionally the longer they stay in Meyer Hall.

C. *The juveniles in question.* The two juveniles involved in this controversy are Desiree and Rodney. Desiree was born in January 1980, and Rodney was born in August of that year. The committee had approved both juveniles for group foster care placement and both were on the waiting list for such placements.

1. *Desiree.* On April 11, 1996, Desiree's mother applied to juvenile court for Desiree's involuntary commitment for treatment of chemical substance abuse. Affidavits filed in support of the commitment alleged that Desiree was associating with gang members. Her association included having been physically branded by the gang as gang property, selling drugs for the gang, and prostituting herself for the gang. Desiree had mutilated herself and had been beaten by gang members. She had been using "substantial amounts" of drugs and alcohol.

On the day the application was filed, Desiree was hospitalized at Broadlawns Hospital in Des Moines. On April 16, the juvenile court adjudicated her as a child in need of assistance under Iowa ˙ Code section 232.2(6)(f) (1995), which provides:

> "Child in need of assistance" means an unmarried child:
>
> . . . .
>
> f. Who is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior towards self or others and whose parent, guardian, or custodian is unwilling or unable to provide such treatment.

On April 24, pursuant to court order, Desiree was transferred from Broadlawns to the Youth Emergency Services Shelter, pending disposition.

On May 2, following a dispositional hearing, the juvenile court confirmed Desiree as a child in need of assistance and placed temporary custody in the department "for placement commensurate with her needs."

On May 13 the State filed a delinquency petition against Desiree for allegedly giving false information to a Des Moines police officer. The juvenile court ordered that Desiree be (1) placed in detention at Meyer Hall, (2) placed on suicide watch, and (3) tested for pregnancy.

2. *Rodney.* In November 1990, the juvenile court adjudicated Rodney as a child in need of assistance, also pursuant to section 232.2(6)(f). The petition alleged that Rodney had been diagnosed with "oppositional defiant disorder" and his parents were financially unable to provide further necessary treatment.

In May 1991, on review of its prior adjudicative order, the juvenile court confirmed Rodney as a child in need of assistance and placed legal custody of him with the department for placement commensurate with his needs.

On October 3, 1995, while Rodney was still under juvenile court jurisdiction as a child in need of assistance, the State filed a delinquency petition against him. The petition alleged that Rodney had committed third-degree harassment in violation of Iowa Code section 708.7(4). The following day, the juvenile court ordered Rodney to Meyer Hall detention center. On October 13 the court adjudicated Rodney delinquent on the harassment charge.

Eventually, Rodney was placed outside the home but later ran away. Later, on April 4, 1996, the court placed Rodney in detention at Meyer Hall. Following a May 3 hearing, the juvenile court ruled that Rodney should be moved to a structured placement in a group foster care home as quickly as possible.

D. *The Hearing.* On July 17, 1996, Desiree's attorney filed a motion, alleging, among other things, the following:

> On May 12, 1996, Desiree was placed in Meyer Hall after allegedly giving false information to a police officer.
>
> Desiree has remained in Meyer Hall to date. She has been approved for group care placement and there is a bed available for her at Hillcrest in Dubuque; however,

the Department of Human Services is unwilling to place her because of financial restraints related to the group care "caps."

Desiree has a detention review hearing scheduled for the 26th day of July, 1996 at 8:00.

It would be in the best interest of the child to review her CINA Disposition at that time also so that the court can review the efforts of the Department to obtain a placement for Desiree that is commensurate with her needs.

The motion requested the court to hear the detention and dispositional matters at the same time.

A week later, Rodney's attorney filed a motion for the court to review his detention at Meyer Hall. The motion alleged the following:

This matter last came on for review by the court on the 29th day of May, 1996, at which time the court ordered the child to remain in the custody of the Iowa Department of Human Services for placement commensurate with his needs; the court having provided specific recommendations for the type of placements to be considered.

Pending placement, the child was ordered held in the Polk County youth detention center.

The child has been accepted for placement but said placement has not occurred.

The child is currently languishing in the limbo of detention placement which is clearly contrary to his best interests and the intentions of the court.

This matter urgently needs to be reviewed.

The juvenile court ordered Desiree's motion and Rodney's motion to be heard at the same time. Before the hearing, Desiree's attorney subpoenaed the director of the department, Charles Palmer, to testify. The department moved to quash the subpoena and suggested the testimony of lower-ranking officials, Frederico Brid and Kenneth Riedel. In its motion, the department alleged that "[c]onsiderations of separation of powers and executive privilege suggest that the director should not be allowed to testify."

Desiree's attorney accepted these lower-ranking officials' testimony in lieu of the director's testimony at the upcoming hearing.

At the hearing, Brid and Riedel testified and were asked questions over the department's standing objection regarding appropriations and the Governor's veto of spending measures.

Following the hearing, the juvenile court ordered immediate group placement for Desiree and Rodney. In its ruling, the juvenile court framed and decided the issue this way:

The issue before the Court is whether the Department of Human Services has the statutory right to withhold placement in group care by reason of perceived "fiscal restraints." The use of the Gateway Committee to determine **when** a child is placed is not statutorily provided for. Nor is the Polk County Department of Human Services Area Administrator Ken Riedel empowered by statute to make that determination. The lack of procedural safeguards would make the use of the Gateway Committee to determine **when** a child may be placed unlawful, even if such review were statutorily mandated. *In the Interest of C.S.*, 516 N.W.2d 851 (Iowa 1994) found that similar methods of the out-of-state placement committee were unlawful and did not protect against arbitrary decision by said committee and denied the child procedural due process. The children are prioritized by the Gateway Committee in an arbitrary and capricious manner in direct violation of the directives of equal protection of the Iowa Supreme Court as set out in the case of *In the Interest of B.B.*, 516 N.W.2d 874 (1994).

The Code in 232.143 provides for communication with the Court when the region is over the statutory group care target; however, the Regional Plan for the Des Moines Region has no method identified, nor is there a target number included in the Regional Plan. The Iowa Code in 232.102, 1A provides that no placement may be made in group foster care if the placement is not in accordance with the regional plan for group foster care placement.

The Supreme Court of Iowa has recognized a right to treatment. *In the Interest of C.S.* provides also that a child should receive minimally adequate treatment. Placement of children such as Desiree who are in need of a group home placement are not receiving minimally adequate treatment at Meyer Hall detention center when no services are being provided beyond food and shelter.

[Desiree] has been found to be a Child in Need of Assistance and ordered into the custody of the Department of Human Services for placement commensurate with her needs. No appeal of the orders has been taken and they are lawful orders. The order for placement is to be immediately executed.

The Court having found that the order of placement is lawful and that the actions of Ken Riedel and the Gateway Committee unlawful, need not address the other issues raised by Counsel.

On appeal, the department raises two issues. The department first contends the juvenile court abused its discretion when it allowed high ranking executive branch officials to be questioned about areas within the discretion of their agency. Those areas concerned appropriations requests and recommendations to the Governor about appropriations. The department also contends the juvenile court erred in overriding the fiscal constraints of the local regional group foster care plan when it ordered immediate placement of Desiree and Rodney rather than ordering the implementation of a new plan.

II. *The Evidentiary Issue.*

■ As mentioned, before the hearing, Desiree's attorney subpoenaed the department's director—Charles Palmer—to testify at the hearing. In its motion to quash, the department raised a separation-of-powers issue. Apparently, the parties agreed to allow Frederico Brid to testify in Palmer's stead. Brid is the head of the division of family and child services and by law is responsible for the State's budget as it pertains to child welfare matters. In the course of his testimony, Brid was asked—over the department's standing objection—to justify the department's position about requesting appropriations for foster care from the legislature. To some extent, Brid was also asked to justify the Governor's position regarding the same matter. The examination inquired into (1) the department's role in certain vetoes of appropriations, (2) the department's decision-making about requesting appropriations from the legislature, and (3) the department's relationship with the legislature and the Governor.

The juveniles respond on two grounds. First, the separation-of-powers issue is moot because the department suggested that Brid testify in Palmer's stead. Second, there was nothing in the juvenile court's ruling suggesting that Brid's testimony was decisive on the ultimate issue. The testimony was therefore harmless. We agree.

■ "An issue is moot if it no longer presents a justiciable controversy because it is has become academic or nonexistent." *In re B.B.*, 516 N.W.2d 874, 877 (Iowa 1994) (quoting *In re Meek*, 236 N.W.2d 284, 288 (Iowa 1975)). The test is whether the court's opinion would be of force or effect in the underlying controversy. *Iowa Bankers v. Iowa Credit Union Dep't,* 335 N.W.2d 439, 442 (Iowa 1983). The department agreed to allow a lesser ranking official to testify in Palmer's stead. That decision rendered moot the separation-of-powers issue as to executive privilege. In addition, even the case the department relies on holds that the separation-of-powers doctrine would not preclude a trial court from calling before it a member of the executive branch for narrowly defined informational purposes. *State Dep't of Health & Rehabilitative Servs. v. Brooke,* 573 So.2d 363, 371 (Fla.Dist.Ct.App.1991).

■ Although we do not decide the issue, the questions about the department's appropriations requests may have invaded the realm of legislative immunity. *See, e.g., Marylanders for Fair Representation, Inc. v. Schaefer,* 144 F.R.D. 292, 299 (Md.1992) (holding that doctrine of legislative immunity protects all parties to the budgetary process if (1) the actor is a government official or an individual working on his behalf; (2) the act itself falls within the sphere of legitimate

legislative activity; and (3) the act is proximate to the legislative arena). Nevertheless, there is nothing in the juvenile court's order suggesting that the court relied on the challenged testimony in reaching its decision to order immediate placement of the two juveniles in group foster care. The admission of such testimony was therefore not prejudicial to the department.

We remind trial courts that they should try to protect not only the independence of the judicial branch but also the constitutional prerogatives of the other branches of government under the separation-of-powers doctrine. Whenever possible—as this case well illustrates—consideration should be first given to calling lesser-ranking officials before a department head is called to testify.

### III. Whether the Juvenile Court Erred in Ordering Immediate Placement Without Ordering Implementation of a New Plan.

The department points out that Iowa Code section 232.143 is the legislature's attempt to contain group foster care costs. The statute provides that the general assembly shall establish a statewide target for the average number of children in group foster care. Iowa Code § 232.143(1). For the year in question, the general assembly simply established a monetary amount, not a bed and day target. 1996 Iowa Acts ch. 1213, § 10(2). Iowa Code section 232.143(2) provides that the department and the juvenile court are to establish a plan for "containing the number of children placed in group foster care ordered by the court within the target allocated to that region pursuant to subsection 1." The plan is to "include monthly targets and strategies for developing alternatives to group foster care placements ... within the amount appropriated by the general assembly for that purpose." Iowa Code § 232.143(2). The department's regional administrator is to "communicate" with the juvenile courts concerning the "status of the regional plan's implementation." Id. State payment for group foster care is to be limited to those placements developed in accordance with a regional plan. Id. § 232.143(3).

The department virtually concedes the plan for the Des Moines area region was inadequate and flawed. But, the department argues, as the above-cited provisions of section 232.143 clearly demonstrate, the juvenile court had co-equal responsibility for setting up and adhering to the local foster care budget. For that reason, the department further argues, the juvenile court—while free to correct any improper procedures in the use of foster care monies—was not free to eliminate the procedures without ordering new ones in their place. In short, when the juvenile court was made aware of any flaws in the system, the court's obligation was to see them corrected and not use those flaws to free itself from the fiscal constraints the legislature obviously intended to impose.

The problem with the department's argument is that imposing an obligation on the judicial branch to come up with a plan to contain costs violates separation-of-powers principles. In addition, even assuming no separation-of-powers problem, the decision-making process for determining group home placement contemplated by the statute constituted an unlawful delegation of legislative authority.

■ A. *Separation of powers.* The separation-of-powers principle is embodied in article III, section 1 of the Iowa Constitution:

> The powers of the government of Iowa shall be divided into three separate departments—the legislative, the executive, and the judicial—and no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted.

Early on, this court held that a statute which imposed a duty on the district court to appoint waterworks trustees violated this constitutional provision. *State ex rel. White v. Barker*, 116 Iowa 96, 111–13, 89 N.W. 204, 208–09 (1902). The court explained the rationale underlying the separation-of-powers principle:

> The division of the powers of government into three different departments—legislative, executive, and judicial—lies at the very foundation of our constitutional

system. The fathers had in mind "Montesquieu's Dissertation on the Spirit of the Laws," in which he said: "There is no liberty if the power of judging be not separated from the legislative and executive powers. When the legislative and executive powers are united in one body or person, there can be no liberty, because apprehensions may arise lest the same monarch or senate should enact tyrannical laws to execute them in a tyrannical manner." He further said: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator. Were it joined to the executive, the judge might behave with all the violence of an oppressor." Recognizing the dangers to be feared from concentration of power, our constitution builders not only created the three departments, but especially provided in section 1, article 3, that "no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed and permitted."

*Id.* at 108, 89 N.W. at 208.

In *Barker*, the court went on to adopt a well-recognized separation-of-powers principle involving constitutional courts like the district court: "[P]owers not in themselves judicial, and that are not to be exercised in the discharge of the functions of the judicial department, cannot be conferred on courts or judges designated by the constitution as a part of the judicial department of the state."

*Id.* at 109, 89 N.W. at 208.

But, as the court explained, there is some flexibility:

Of course, the act itself need not be judicial in character. If the general power be judicial, or if the act itself be in aid of some judicial function, it is sufficient. Thus the exercise of judicial power may be essential in the discharge of executive functions. And courts, in the discharge of their duties, may be required to exercise executive or administrative powers. They may be authorized to make contracts to keep court rooms in repair; may appoint commissioners to apportion and assess damages for the opening of a highway; may appoint jury commissioners; may determine whether a municipal corporation shall be created, or adjoining territory annexed. But in each and all of these cases the powers are either judicial in character, or are to be exercised in the discharge of functions pertaining to the judicial department. If the matter is one requiring some judicial determination, it may be left to the court, or to judges, although it is not involved in the determination of an actual case litigated in the ordinary manner. Thus, the propriety and necessity of the construction of a bridge over railway tracks may be left to a judge for a decision. Courts cannot fix railroad, telegraph, telephone, water, and other rates, although they pass on the reasonableness thereof. Fixing rates in such instances is purely a legislative act, which cannot be delegated to a constitutional court.

*Id.* at 110–11, 89 N.W. at 209 (citations omitted).

Applying these principles, the *Barker* court had little trouble concluding that the statute in question violated the constitutional provision regarding separation of powers. *Id.* at 111–12, 89 N.W. at 209. As the court explained:

The appointment of trustees to manage and control a system of waterworks belonging to a municipal corporation in advance of litigation or of any dispute concerning their management or control is surely not a judicial function. It is more nearly administrative; but with the affairs of the corporation and the management of its property courts have nothing to do in advance of some dispute. If courts are to select city officials, they may also select those who are to administer the affairs of the county; and it is not going too far to say that they may also be authorized to select state officials. Such a union of power would ... "result in tyranny." "That which distinguishes a judicial function from a legislative act is that the one is a determination of what an existing law is in relation to some existing thing already

done or happened, while the other is a predetermination of what the law shall be for the regulation of future cases falling under its provisions." ... The appointments authorized by the act in question are in no manner connected with the discharge of judicial duties, and to our minds clearly fall within the prohibition of [the Iowa constitutional provision regarding separation of powers.]

*Id.* at 111–12, 89 N.W. at 209 (citations omitted); *see also* 16 Am.Jur.2d *Constitutional Law* § 356, at 901 (1979) ("The legislature cannot delegate or confer legislative power on the courts or impose legislative duties upon them, because such duties are not judicial in nature. An act of the legislature delegating legislative powers to courts is unconstitutional.").

As mentioned, Iowa Code section 232.143 mandates several things. First, the general assembly—on an annual basis—is to set "[a] statewide target for the average number of children in group foster care placements on any day of a fiscal year." Iowa Code § 232.143(1). Second,

the department and the *juvenile court* shall establish a plan for containing the number of children placed in foster care ordered by the court within the target allocated to that region pursuant to subsection 1. The plan shall include monthly targets and strategies for developing alternatives to group foster care placement in order to contain expenditures for services provided to children within the amount appropriated by the general assembly for that purpose.

Iowa Code § 232.143(2) (emphasis added). Last, "[t]o the extent possible, the department and the *juvenile court* shall coordinate the planning required under this subsection with planning for services paid under section 232.141, subsection 4." *Id.* (emphasis added).

Clearly, the juvenile court's mandates under these provisions to accomplish the legislature's goal of cost containment for group foster care placements are not judicial functions. Nor are the mandates in aid of some judicial function. Rather, the mandates are nothing more than the legislators' way of abdicating the responsibility for policy and

funding decisions they were elected to make. These mandates clearly contemplate discouraging group foster care placements in favor of alternate treatment options as a way of containing costs of foster care placements. We have recognized that such policy and funding decisions are "essentially a legislative function." *In re C.S.*, 516 N.W.2d 851, 858 (Iowa 1994); *see also Rush v. Ray*, 362 N.W.2d 479, 483 (Iowa 1985) (holding that power to appropriate funds and restrict their use is legislative function); *Graham v. Worthington*, 259 Iowa 845, 857, 146 N.W.2d 626, 635 (1966) (holding that legislature governs expenditure of state funds). In short, imposing these mandates on the juvenile court clearly violates the separation-of-powers principle found in article III, section 1 of the Iowa Constitution. For that reason, the mandates as they pertain to the juvenile court have no force and effect.

■ **B.** *Unlawful delegation of legislative authority.* The mandates are also an unlawful delegation of legislative authority to the juvenile court, and to the Iowa Department of Human Services for that matter. As we noted in *In re C.S.*,

[l]egislative power is the power to make, alter, and repeal laws and to formulate legislative policy. Executive power is the power to put the laws enacted by the legislature into effect. Based on this division, legislative delegations of power to an executive body have historically required a clear delineation of legislative policy and substantive standards to guide the agency in its implementation of that policy.

The more modern view adopted by our court is that precise substantive guidelines or standards are not required in the legislation if adequate procedural safeguards are provided. The procedural safeguards *must advance the legislature's purpose and must preclude arbitrary, capricious, or illegal conduct by the agency.*

*In re C.S.*, 516 N.W.2d at 859 (citations omitted).

■ Judicial power is "the power to interpret the constitution and laws, and apply them, and decide controversies." *City of Cedar Falls v. Flett*, 330 N.W.2d 251, 255 (Iowa

1983). The principles regarding substantive guidelines and procedural safeguards pertaining to a legislative delegation of authority to an executive body apply with equal force to a legislative delegation of authority to the judicial branch. *Warren County v. Judges of Fifth Judicial Dist.*, 243 N.W.2d 894, 898 (Iowa 1976) ("We believe principles developed for testing the constitutionality of a delegation of legislative power to the executive branch may be applied in testing a delegation to the judicial branch.").

In *In re C.S.*, we had before us a statute similar in purpose to Iowa Code section 232.143. In fact, the statute in *In re C.S.*—Iowa Code section 232.187(1)—was passed at the same time as section 232.143. Section 232.187 mandated that the department and the judicial department establish regional out-of-state placement committees. The statute expressed a legislative intent that the out-of-state committees reduce out-of-state group foster care placements by twenty-five percent during a specified period.

In *In re C.S.*, we held that section 232.187(1) provided no procedural safeguards to protect against an arbitrary decision. *In re C.S.*, 516 N.W.2d at 859. For example, the statute did not (1) give the child or the child's parents the right to appear before the committee and (2) allow for review of the committee's decision. A committee's decision to recommend against an out-of-state placement under section 232.187 was final and binding on the juvenile court. *Id.* Neither procedural protection—the right to appear before the committee and review of the committee's decision—is provided for under section 232.143. We likewise find that section 232.143 provides no procedural safeguards to protect against an arbitrary decision as to group foster care placement of a juvenile.

Because section 232.187 provided no procedural safeguards, we next had to decide in *In re C.S.* whether section 232.187 provided the out-of-state committees with substantive standards to guide their deliberations. *Id.* We held that providing for (1) a twenty-five percent reduction in placements and (2) the consultation with experts were insufficient substantive guidelines for an out-of-state

placement committee "to determine which placements to approve and on what basis." *Id.* We concluded that lacking procedural safeguards and substantive guidelines, the delegation under section 232.187 "to the out-of-state committees of the power to determine who is to receive the funding available for out-of-state placements is unlawful." *Id.*

Substantive guidelines are similarly lacking under section 232.143. The only guidance is to develop a plan based on monthly number targets. The decision-maker—in this case the Gateway Committee—itself is to devise such targets, providing even fewer known standards and guidelines. We note that the legislature for the fiscal year involved did not provide an overarching number to allocate among the regions. Instead, the legislature only provided a set dollar amount limit.

In short, the legislature delegated the power to determine individual group foster care placement under section 232.143 without procedures or guidelines necessary to prevent arbitrary and capricious decisions about individual placements in group foster care. For that reason this delegation of power was unlawful. The juvenile court was correct in concluding that the absence of approval by the Gateway Committee was no impediment to its decision to place the juveniles in question in group foster care. Because there was money available to accommodate the placements here, the juvenile court was well within its discretion in ordering the placements.

### IV. *Disposition.*

Because the department agreed to allow a lesser-ranking official to testify in place of the department's director, the separation-of-powers issue as to executive privilege is moot. Additionally, the court did not rely on the official's testimony in ordering immediate placement of the two juveniles in group foster care. The admission of such testimony was therefore not prejudicial to the department.

■ The juvenile court was well within its discretion in ordering immediate placement of the juveniles for three reasons. First, the attempted imposition on the juvenile court to

devise a plan in conjunction with the department for group care placements to meet the cost containment goal of the legislature violated the Iowa constitutional provision regarding separation of powers. The juvenile court was therefore under no statutory obligation to repair an otherwise inadequate and flawed plan before ordering the placements. Second, the legislature's delegation of the power to formulate the plan to the juvenile court and the department was unlawful and therefore not binding on the juvenile court. Last, there was money available to fund the placements.

For all of these reasons, we affirm.

**AFFIRMED.**