James BERNAU, Mary Bernau, Carlisle Beekman, Lorraine Beekman, Richard Laube, Judy Laube, Merlin Stock, Cheryl Stock, Gary Bernau, Patricia Bernau, David Bernau, and Jolene Bernau, Appellants,

v.

IOWA DEPARTMENT OF TRANSPORTATION, The Iowa Transportation Commission, Catherine Dunn, Chairperson, Lloyd E. Clark, Commissioner, Janice Johnson, Commissioner, Richard Pellet, Commissioner, Bonnie Vetter, Commissioner, Marlin Volz, Jr., Commissioner, and Daniel Wiedemeier, Commissioner, Appellees.

No. 96–1593.

Supreme Court of Iowa.

July 1, 1998.

Richard A. Pundt and David J. Smith of Pundt Law Offices, Cedar Rapids, for appellants.

Thomas J. Miller, Attorney General, David Ferree, Special Assistant Attorney General, and Mark Hunacek, Assistant Attorney General, for appellees.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, ANDREASEN, and TERNUS, JJ.

LAVORATO, Justice.

In this judicial review proceeding, affected property owners and renters appeal from a district court ruling that affirmed a decision of the Iowa Transportation Commission (commission) to select a certain route for the U.S. Highway 218 Charles City bypass. The property owners and renters contend that the commission decision violates Iowa Code section 306.9 (1993). They also challenge the Iowa Department of Transportation's (IDOT) refusal to hold a contested case hearing, promulgate an administrative rule, and conduct a corridor hearing. We affirm.

I. *Facts.*

The appellants own or rent farmland in Floyd County, Iowa. The commission's bypass decision affects their property. The Charles City bypass is part of the Avenue of the Saints project from St. Louis, Missouri to St. Paul, Minnesota. The Saints project involves the construction of a four-lane divided roadway corridor from Waterloo, Iowa to Mason City, Iowa.

The proposed bypass project provides for the relocation of U.S. Highway 218 in Floyd County. The bypass begins near the intersection of County Road B–59 and existing U.S. Highway 218 southeast of Charles City

and extends northwest to the C.P. rail system, bypassing Charles City to the south and west.

The appellants do not dispute the entire length of the bypass. What they do dispute is the segment that runs from the intersection of U.S. Highway 218 and County Road B–59 to the intersection of U.S. Highway 218 and County Road T–64. This segment is commonly referred to as the "south tie-in."

Notwithstanding the present dispute, local residents of Charles City generally support the bypass proposal. Many consider the speedy construction of the bypass essential for relieving an economic blight that has settled over the area since the departure of a farm implement plant. The record shows that currently a number of businesses plan to locate to the area once they know the location of the bypass.

Uncertainty has surrounded the location of the bypass since the project's inception more than eight years ago. In October 1990 the commission conducted a location public hearing on the bypass.

Following the hearing, the commission approved a survey alignment for the south tie-in. The alignment began on existing U.S. Highway 218 and followed the highway north before curving into an east-west run along property lines.

Although the bypass project itself received public support, the east-west segment of the bypass generated considerable public debate. The debate prompted the IDOT to initiate additional studies to examine a suggested alignment located one-half mile farther south of the one the commission approved following the October 1990 hearing.

The IDOT presented a report of its studies to the commission in another public hearing in Charles City in December 1990. In February 1991 the commission convened a third public hearing at which the commission agreed with local residents to shift the proposed location of the bypass to the south. The commission ordered the IDOT to survey and prepare designs to complete the bypass.

During the design phase the IDOT staff encountered a number of problems. First, the original alignment encroached on a quarry and landfill site, posing construction difficulties and environmental concerns. Second, the original alignment traversed the Bloody Creek area at such an angle that traffic staging and property access became troublesome and a longer, more expensive bridge would be needed. Last, there was some concern that the bypass location would adversely affect an area of some historical significance.

These problems prompted the IDOT to explore other alternatives. One alternative located the bypass east of the original alignment, and one located it further west. An engineering consultant study discussing the various alternatives uses the phrase "Alternate D" to refer to the west bypass. At some point one of the alternatives was discarded and "Alternate D" became "Alternate C."

The consultant study recommended "Alternate C"—the bypass west of the original alignment. They did so for the following reasons: Alternate C would save more than $2 million in construction costs, eliminate the need to acquire several residences, and eliminate encroachment on an historical site.

In December 1992 IDOT held an informal public informational hearing to discuss the various bypass alternatives. A number of people attended this meeting including James Bernau, one of the appellants. Previously, IDOT had given him and several other appellants notice of the hearing. The IDOT included in the notice a map of the new alignment alternatives.

In February 1993 the commission met and considered the bypass alternatives. The commission considered the pros and cons of each alternative. Consideration of Alternate C stirred up considerable public objection, principally from affected landowners. Despite the objections, the commission favored additional study of Alternate C and voted accordingly.

Before taking irreversible action on the matter, the commission held another public hearing in January 1994. Several of the appellants were among a number of people who attended this hearing.

In May 1994 the IDOT held a project review meeting. The IDOT staff approved the project for presentation to the commission. The commission took up the matter the following month in a public hearing. James Bernau was present and spoke in opposition to Alternate C. The commission heard the previous pros and cons of the various alternatives and in the end voted not to approve Alternate C. One commission member, however, noted that the project would be brought back to the commission.

Three weeks later, following a public hearing, the commission reversed itself and approved Alternate C. James Bernau was also at this hearing and again addressed the commission. In reaching its decision, the commission again considered the pros and cons of the various alternatives.

## II. *Proceedings.*

The commission's decision approving Alternate C prompted James Bernau and the other appellants to seek judicial review in the district court. The petition for judicial review alleged that the commission's decision violated the command of Iowa Code section 306.9.

At the same time, the appellants filed petitions with the IDOT. They petitioned the agency to, among other things, (1) promulgate a rule to implement Iowa Code section 306.9, (2) grant them a contested case hearing, and (3) grant them a "proper corridor" hearing. The agency denied the petitions.

The district court ruled the IDOT correctly denied the petitions. The court also ruled that the commission did not violate Iowa Code section 306.9. The court acknowledged that this code provision placed substantive burdens on the commission's decision making. It concluded, however, the commission correctly exercised its discretion given all the factors militating against the other alternatives.

## III. *Highway Placement and Iowa Code Section 306.9.*

 A. *Highway placement.* Generally speaking, the decision where to locate a highway rests solely within the discretion of the legislative body, or its delegated administrative agency. 39 Am.Jur.2d *Highways, Streets, and Bridges* § 49, at 438 (1968). Thus, the power to determine the location of a highway is a legislative, and not a judicial, function. *Id.* In the absence of fraud, corruption, oppression, or gross injustice, courts are not to interfere with that function. *Id.*

All of this is true in Iowa. *See Harvey v. Iowa State Highway Comm'n*, 256 Iowa 1229, 1231, 130 N.W.2d 725, 727 (1964). The legislature has empowered the Highway Division of IDOT to make initial recommendations regarding location of highways and has empowered the commission to make decisions regarding which of the alternatives proposed should be adopted. Iowa Code §§ 307.10, 307A.2(12); *Pundt Agric. Inc. v. Iowa Dep't of Transp.*, 291 N.W.2d 340, 345 (Iowa 1980).

B. *Iowa Code section 306.9.* The legislature, however, has circumscribed the commission's discretion with respect to road relocation by passing Iowa Code section 306.9. Section 306.9 provides in relevant part:

It is the policy of the state of Iowa that relocation of primary highways through cultivated land shall be avoided to the maximum extent possible. When the volume of traffic for which the road is designed or other conditions, including designation as part of the network of commercial and industrial highways, require relocation, diagonal routes shall be avoided if feasible and prudent alternatives consistent with efficient movement of traffic exist.

The improvement of two-lane roads shall utilize the existing right-of-way unless alignment or other conditions, including designation as part of the network of commercial and industrial highways, make changes imperative, and when a two-lane road is expanded to a four-lane road, the normal procedure shall be that the additional right-of-way be contiguous to the existing right-of-way unless relocated for compelling reasons, including the need to provide efficient movement of traffic on the network of commercial and industrial highways.

C. *The appellants' contentions.* The appellants contend the · south tie-in of the

Charles City bypass, commonly referred to as Alternate C, violated this provision in several respects. In support of their contention, the appellants argue that Alternate C involves greater diagonal severance of farmland than the other two alternatives. In addition, they argue that Alternatives A and B are feasible and prudent, are consistent with the efficient movement of traffic, and utilize existing U.S. Highway 218.

The appellants' main complaint, however, is that in choosing Alternate C rather than either Alternates A or B, the commission violated the clear mandate of section 306.9 because the commission considered the protection of farmland as just one of a number of factors rather than the primary factor. In short, the appellants insist that section 306.9 elevates the farm over all other community and policy interests, individually or collectively.

D. *Statutory interpretation and standard of review.* Whether the commission violated section 306.9 turns on our interpretation of this statute and our standard of review. In interpreting statutes, our goal is to discover the true intention of the legislature, considering the clearly stated objects and purposes involved. *Matter of Girdler,* 357 N.W.2d 595, 597 (Iowa 1984). We begin by looking to the statute's language. *Collins v. King,* 545 N.W.2d 310, 312 (Iowa 1996). Where the legislature has not defined words of the statute, we may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage. *State v. Kellogg,* 542 N.W.2d 514, 516 (Iowa 1996).

As we alluded, section 306.9 imposes substantive requirements upon the discretion of the commission in the relocation of highways—as well it should. *See In re D.C.V.,* 569 N.W.2d 489, 497 (Iowa 1997) (holding legislative delegations of power require "clear delineation of legislative policy and substantive standards to guide the agency in its implementation of that policy"). We agree with the district court that the first sentence of the statute manifests a legislative policy to protect farmlands. As the district court noted, by declaring that "relocation of primary highways through cultivated land

shall be avoided to the maximum extent possible," the legislature wants to minimize the extent to which highway projects convert farmland to non-agricultural uses.

Later, in the first paragraph, section 306.9 makes a command, by using the word "shall." Iowa Code § 4.1(30)(a) ("shall" imposes a duty). The commission "shall" avoid a diagonal road through cultivated lands *"if feasible and prudent alternatives consistent with efficient movement of traffic exist." Id.* § 306.9 (emphasis added).

The second paragraph of section 306.9 imposes two additional duties upon the commission. First, when improving two-lane roads, the commission "shall utilize the existing right-of-way unless alignment or other conditions, including designation as part of the network of commercial and industrial highways, makes changes imperative." *Id.* This duty is not, however, without qualification. Thus, the present alignment itself as well as other conditions can dictate not using the existing right-of-way. Additionally, the very fact that the improvement is a designated part of the network of commercial and industrial highways can likewise dictate not using the existing right-of-way.

Second, when a two-lane road is expanded to a four-lane road, "the normal procedure shall be that the additional right-of-way be contiguous to the existing right-of-way unless relocated for compelling reasons, including the need to provide efficient movement of traffic on the network of commercial and industrial highways." *Id.* Again, the duty is not absolute: Compelling reasons can dictate not using the existing right-of-way. "Compelling reasons" can include "efficient movement of traffic on the network of commercial and industrial highways."

1. *Analogous federal legislation.* Like the district court, we look to an analogous federal statute to aid us in our analysis both from the standpoint of statutory interpretation and scope of review. We refer to § 4(f) of the Department of Transportation Act, enacted at 49 U.S.C. § 303(c). Section 4(f) allows use of federal funds for highways constructed on parklands or historic sites only if there "is no prudent and feasible alternative

to using that land; and the program or project includes all possible planning to minimize harm" to the protected area.

Thus, like section 306.9, § 4(f) seeks to protect a valued resource and imposes a "prudent and feasible" standard. Cases interpreting § 4(f) are therefore persuasive. Foremost among these cases is *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105, 97 S.Ct. 980, 984, 51 L.Ed.2d 192, 202 (1977). In *Citizens*, an organization, individuals, and a conservation group sued to enjoin the Secretary of Transportation from releasing federal funds to a state highway department for the construction of an expressway segment through a city park. The Sixth Circuit affirmed a district court ruling sustaining the Secretary's summary judgment motion, and the Supreme Court granted certiorari.

*Citizens* dealt primarily with the question of an agency's responsibility to generate a record and the appropriate standard of judicial review. *Citizens*, 401 U.S. at 409–10, 91 S.Ct. at 820, 28 L.Ed.2d at 149–50. The Court held that litigation affidavits containing "post hoc" rationalizations were not an adequate basis for review of the Secretary's action in authorizing expenditure of federal funds for the construction of the expressway segment through the city park. *Id.* at 419–20, 91 S.Ct. at 825, 28 L.Ed.2d at 155. The Court remanded the case to the district court for plenary review based on the full administrative record before the Secretary at the time he made his decision. *Id.*

The decision also noted the Act provided "clear and specific directives" and was a "plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." *Id.* at 411, 91 S.Ct. at 821, 28 L.Ed.2d at 150.

In *Citizens*, the Court more specifically defined "feasible" to mean in this context an agency must "find that as a matter of sound engineering it would not be feasible to build the highway along any other route." *Id.*, 91 S.Ct. at 821, 28 L.Ed.2d at 150.

As to the "prudence" requirement, the Court held that prudence in the context of § 4(f) does not require a wide-ranging balancing of interests such as costs and safety—it will always be less costly and safer to build straight through a park. *Id.* at 411–12, 91 S.Ct. at 821, 28 L.Ed.2d at 150. The Court went on to note that while "costs and disruption of the community" were not to be ignored, "[i]f the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems." *Id.* at 413, 91 S.Ct. at 822, 28 L.Ed.2d at 151.

In *Eagle Foundation, Inc. v. Dole*, 813 F.2d 798 (7th Cir.1987), the Seventh Circuit seems to have retreated from the absolute language of *Citizens;* however, we view *Eagle* as simply giving common-sense meaning to *Citizens.*

In *Eagle*, the court considered its standard of review to be very narrow, asking only whether the agency "took a close look at the things that matter and made the hard decisions." *Eagle*, 813 F.2d at 803. The standard of review is necessarily narrow because the Secretary must decide what is "prudent" and such an inquiry.

> calls for judgment, for balancing, for the practical settlement of disputes on which reasonable people will disagree. The statutory standard makes deferential review inevitable.

*Id.* at 804. Such a standard ensures that the court will not substitute its judgment for that of the agency. *Id.* at 803.

More specifically, "the court's role is to find out whether the Secretary considered what she had to consider, put out of mind what she was forbidden to consider, and dealt rationally with the competing relevant issues." *Id.* The Secretary must decide "whether there is powerful reason to build through the § 4(f) property"; the court on the other hand must determine "whether the Secretary made a reasoned judgment after a hard look at the facts." *Id.* In the end, the court could set aside the Secretary's decision only if it was "arbitrary or capricious." *Id.* at 804 (citing *Citizens*, 401 U.S. at 414–16, 91 S.Ct. at 822–24, 28 L.Ed.2d at 151–53). This standard, the court said, is "one of the most

deferential standards of administrative law." *Id.*

The court in *Eagle* did not overlook the Supreme Court's use of the word "unique" in *Citizens* and refused to believe the Supreme Court meant what it said:

"Unique" is a word without degrees; a situation is unique (nonpareil, one of a kind) or it is not. There is nothing "unique" about the reasons given for believing that [the protected parkland] is the best location for the [limited access highway]. *The other routes are longer, and more expensive, will take more time to complete, disrupt farm lands, produce erosion and ugly concrete canyons, kill the local wildlife, and may contain steep grades and sharp bends that endanger travelers (especially in icy conditions).* None of these is "unique." America's highways present examples of delay, cost overruns, disfigured landscape, deceased wildlife, severed farms, and dangerous grades in abundance. *Yet we cannot believe that the Supreme Court meant that if a risk or cost has been accepted, or an obstacle overcome, for any highway in the United States, then it always must be accepted or overcome in preference to the use of any § 4(f) lands, however trifling the effects of using the § 4(f) lands.*

*Id.* (emphasis added).

Explaining that the Supreme Court used the word "unique" for emphasis rather than as a substitute for the statutory term "prudent," the court in *Eagle* went on to say:

[*Citizens* ] was being emphatic, not substituting "unique" for "prudent" in the context of § 4(f). The Court made it pellucid that the reasons for using the protected lands have to be good ones, pressing ones, well thought out; the Secretary must start with a strong presumption against turning chlorophyll cloverleafs in the parks into concrete ones; but even after starting from this presumption it may be prudent to use the § 4(f) land. If the Secretary makes that hard decision, it must be respected.

*Id.* at 804–05.

According to *Eagle*, a "prudent judgment by an agency is one that takes into account everything important that matters. A cumulation of small problems may add up to a sufficient reason to use § 4(f) lands." *Id.* at 805. Even though all of the factors cited in support of the Secretary's decision were not unusual for a construction project, the cumulative effect satisfied the "prudence" standard. *Id.*

Following this rationale, the Fourth Circuit has held that a cumulation of problems provides "compelling reasons" for an agency to use protected lands for a road. *Hickory Neighborhood Defense League v. Skinner*, 910 F.2d 159, 163 (4th Cir.1990). Such problems in *Hickory* included access, disruption of housing, traffic operational difficulties, safety, and failure to meet the objectives of the project. *Id.* at 163–64.

2. *Analogous Iowa legislation and cases.* We have employed similar analyses under Iowa Code section 478.18 governing placement of power lines. *See Anstey v. Iowa State Commerce Comm'n*, 292 N.W.2d 380, 387 (Iowa 1980); *see also Gorsche Family Partnership v. Midwest Power*, 529 N.W.2d 291, 293 (Iowa 1995). Section 478.18 allows construction of power lines away from division lines "wherever ... practicable and reasonable." The "practicable and reasonable" requirement implicates "engineering considerations," and courts are not permitted to examine each one for its correctness. *Anstey*, 292 N.W.2d at 387–88. We did mention that the selected route was cheaper, safer, and disrupted less land. *Id.* at 388. We noted that cost alone was an improper basis for choosing between a conforming and a nonconforming alternative; cost, however, could be used to discriminate between two conforming alternatives. *Id.*

In *Gorsche*, we noted that the proper method of analysis was to determine if the otherwise conforming power line placement was not feasible or practicable. *Gorsche*, 529 N.W.2d at 293. In that determination, we allowed consideration of "land usage, environmental impact, and economics." *Id.*

E. *The proper standard of review under Iowa Code section 306.9.* Iowa Code chapter 17A governs our review, which is at law. *Mortimer v. Fruehauf Corp.*, 502 N.W.2d 12,

14 (Iowa 1993). Under Iowa Code section 17A.19(8), we can affirm, reverse, or modify the agency action or grant other appropriate relief when the agency's decision is (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) in violation of an agency rule; (d) made upon unlawful procedure; (e) affected by other error of law; (f) in a contested case proceeding, unsupported by substantial evidence in the record made before the agency when the record is viewed as a whole; or (g) unreasonable, arbitrary or capricious or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.

There was no contested case hearing in this case. Later, we explain why a contested case hearing was not appropriate in this case. Our standard of review therefore does not involve the substantial evidence standard.

■ Taking our cue from *Citizens* and *Eagle*, we think the proper standard of review in this case is whether the commission's decision was arbitrary or capricious. Thus, we will not reverse the commission's decision unless the appellants have established that the commission's decision was arbitrary or capricious.

■ When applied to test the propriety of agency action, "arbitrary" or "capricious" means the action complained of was without regard to the law or facts. *Arora v. Iowa Bd. of Med. Exam'rs,* 564 N.W.2d 4, 7 (Iowa 1997). In our review, we apply the arbitrary or capricious standard to the agency's actions to determine whether our legal conclusions are the same as those the district court reached. *Mortimer,* 502 N.W.2d at 14. If our conclusions are the same, we affirm; if they are not, we reverse. *Id.*

■ F. *The merits.* It is true the commission chose Alternate C despite the clear contrary statutory preference for protection of farmland. The plain language of section 306.9, however, requires no blind preference for farmland—indeed the statute's plain language allows a diagonal road if no other "feasible and prudent alternatives consistent with efficient movement of traffic exist." As the district court noted, any of the alterna-

tives before the commission would have led to a diagonal highway, and existing U.S. Highway 218 is itself diagonal.

As the appellees point out, the qualifying language in section 306.9 is necessary to give the commission discretion to determine the location of the highway. Our task is to determine whether the facts and the law support the commission's exercise of that discretion.

The record shows that Alternates A and B would have lesser impact on farmland than Alternate C. On the other hand, an engineering consulting report recommended Alternate C because of its "feasibility and constructibility." In support of that recommendation, the report noted that Alternate C (1) eliminated the need for dual bridges over present U.S. Highway 218 and the need for crossing existing 218 near Underwood Avenue; (2) avoided high fields and deep cuts, saving approximately 800,000 cubic yards of earth work; (3) eliminated the need to acquire several residences; (4) eliminated encroachment on an historic farm and on a nearby quarry; (5) had no effect on the T-64 interchange other than to reduce the tangent distance between the end of the north curve and the ramp tapers; (6) simplified construction staging, thereby improving "constructibility"; (7) improved creek crossings; and (8) would likely save construction costs in excess of $2 million.

Apparently relying on this report, the commission gave the following reasons in February 1993 for selecting Alternate C:

> The two alternatives located east of present U.S. 218 (Alternates A and B) have lesser farmland impacts, but also require displacement of four homes, encroach onto the former Cook family farm, and are more expensive to construct. The alternative located west of present U.S. 218 (Alternate C) has the greater farmland impacts, but also avoids the need for displacing homes, simplifies construction staging, and is less expensive to build.

> Comments received at and following the meeting were mixed, with those impacted by a particular alignment, in particular, Alternate C, voicing support for one that

would avoid disrupting their home and/or farming operation. The Floyd County Board of Supervisors have taken a position in opposition to Alternate C, citing prime farmland and diagonal severance impacts, safety concerns in regard to access, and increased transfer of jurisdiction mileage. Thus, the commission considered the diagonal nature of Alternate C but concluded this disadvantage was outweighed by the advantages of Alternate C.

The commission properly considered the costs of the alternatives because all three alternatives are nonconforming, diagonal routes. The cost, combined with the other disadvantages of Alternates A and B, overshadows the policy of farmland integrity preservation—comparable to the facts in *Eagle.* In *Eagle,* nearly identical construction, economic, and condemnation problems surfaced. There, the court considered the intrusion a justified act of discretion.

We think the commission used "sound engineering" principles to reach a practical decision, thus satisfying the "feasible" requirement. We also think the commission acted in a manner consistent with that of a reasonable, well-informed officer, taking into account "everything important that matters." *Eagle,* 813 F.2d at 805. The commission engaged in a lengthy public debate over the alternatives. Its decision emerged after nearly four years of study, public hearings, and unknown hours of staff labor. In short, the commission satisfied the prudence requirement.

Finally, in reaching its decision that it should not overturn the commission's decision, the district court concluded:

The commission was not required to give plenary consideration to every conceivable alternative before concluding that there are no feasible and prudent alternatives to the diagonal use of farmland. However, the [commission] should be able to demonstrate a reasoned methodology for narrowing the range of alternatives.

This record demonstrates that [the commission's] choice was made in a methodical, reasoned way, consistent with the purposes of the project and the general policy and specific limitations of section 306.9.

In addition, whether the project is viewed as an improvement of a two-lane road or as an expansion to a four-lane road, the Court concludes [the commission] did not violate section 306.9. Highway 218 was being improved or expanded to connect to a highway network. The alternative chosen furthers the objective of providing efficient movement of traffic. Again, given the problems inherent in the other alternatives, and the purposes of the project, it was imperative or compelling not to use the present right-of-way of Highway 218.

... The present record provides a sufficient basis for the [commission] to have concluded that no feasible and prudent alternatives consistent with the efficient movement of traffic existed so as to allow for avoidance of the diagonal route.

We agree with the district court. We would add that we are satisfied the commission took a close look at the things that mattered and made the hard decision. We conclude the commission properly considered the facts and the law in reaching its decision. Its decision was therefore not arbitrary and capricious and ought to stand.

IV. *Rulemaking.*

■ The appellants next complain that the IDOT should not have refused their request for promulgation of a rule implementing section 306.9. By its request, the appellants contend they sought clarification and interpretation of section 306.9 to protect against secret rulemaking prohibited by Iowa Code section 17A.3. The appellants think the agency's actions in this case constituted secret rulemaking because it interpreted statutory protection of farmland in a manner inconsistent with section 306.9.

In support of their argument, the appellants seize on the agency's use of the word "policies" in the following passage of the agency's denial: "After receiving all necessary input, the IDOT decision makers confer and, considering all relevant factors, *including the policies set forth in section 306.9* and any other applicable statutes, decide on the appropriate location." By using the word

"policies," the appellants insists the agency was incorrectly interpreting section 306.9 as imposing no limitations on the agency's discretion.

We agree with the IDOT that the appellants read too much into the word "policies." Even this court has referred to the requirements of section 306.9 as "policies." *See Pundt,* 291 N.W.2d at 343 ("[W]e must remand the case to DOT for reconsideration of the alternative routes in light of the policy expressed in [section 306.9].")*.* The IDOT should not have to second guess this court's use of the word "policy." We also agree with the IDOT that what constitutes the agency's interpretation of law is the actual agency action, and, in this case, the district court and we agree that the commission's action was in compliance with section 306.9.

■ Iowa Code section 17A.7 governs agency rulemaking. It pertinently provides: "An interested person may petition an agency requesting the promulgation ... of a rule..... Within sixty days after submission of a petition, the agency *either shall deny the petition in writing on the merits, stating its reasons for the denial,* or initiate rule-making proceedings ... or issue a rule...." (Emphasis added.) All that section 17A.7 requires is "that an agency give fair consideration to the propriety of issuing the proposed rule. It does not require the agency to take a stand on the substantive issues that might prompt the proposal of a rule." *Community Action v. Iowa State Commerce Comm'n,* 275 N.W.2d 217, 219 (Iowa 1979).

The IDOT denied the appellants' petition for rulemaking in writing, stating:

Not all agency action requires the promulgation of administrative rules. The selection of the location of a highway is an example of this. Highway locations are determined on a case by case basis, after extensive discussion, meetings with the public, and the providing of notice to, and an opportunity to be heard by, all affected individuals. After receiving all necessary input, [IDOT] decision makers confer, and, considering all relevant factors, including the policies set forth in section 306.9 and any other applicable statutes, decide on the appropriate location. That is the policy

that was followed here. Iowa Code section 306.9 was considered in the decision to select the location of the Charles City bypass. The promulgation of administrative rules is not necessary in these circumstances, and would not have affected the final decision.

We conclude this refusal was a denial on the merits and constituted a fair consideration of the appellants' request. The IDOT complied with the requirements of section 17A.7 and was under no duty to promulgate a rule. The district court was correct in so deciding.

## V. *Contested Case Hearing.*

■ The appellants also complain that they should have had a contested case hearing before the commission selected Alternate C. The appellees, on the other hand, contend the hearing required is legislative in nature. As this court has previously held, "[t]he importance of the distinction lies in the procedural due process which attaches to contested cases." *Polk County v. Iowa State Appeal Bd.,* 330 N.W.2d 267, 276 (Iowa 1983).

Iowa Code chapter 17A divides administrative action into three categories. These include rulemaking, adjudication (referred to as contested case), and other "agency action." *See* Iowa Code §§ 17A.2(11), 17A.2(5), 17A.2(2). "Agency action" is the "gap-filler": "[I]f administrative action does not fall within the definition of 'rulemaking' or 'contested case,' then it must be 'agency action.'" *Polk County,* 330 N.W.2d at 276–77.

The parties do not contend that the hearing in question falls within the parameters of rulemaking. So we need only decide whether the hearing is legislative in nature—that is whether the hearing falls within the parameters of other "agency action"—or whether the hearing falls within the parameters of a contested case proceeding.

A hearing falls within the adjudication or contested case category if the constitution or a statute requires an evidentiary hearing. Iowa Code § 17A.2(5). An evidentiary hearing required by section 17A.2(5) is "an oral proceeding whose purpose is to determine disputed facts of particular applicability

known as adjudicative facts—the who, what, when, where, and why of particular individuals in specified circumstances." *Polk County,* 330 N.W.2d at 277 (quoting Arthur E. Bonfield, *The Definition of Formal Agency Adjudication Under the Iowa Administrative Procedure Act,* 63 Iowa L.Rev. 285, 294 (1977) [hereinafter Bonfield] ). "If the hearing required is not an evidentiary hearing, the adjudication is merely an informal adjudication and falls under the rubric of 'agency action.' " *Id.* (citing Bonfield, *Formal Agency Adjudication,* 63 Iowa L.Rev. at 288).

■■■ Constitutionally, a person has a right to an evidentiary hearing only with respect to adjudicative facts. 2 Kenneth Culp Davis & Richard J. Pierce, *Administrative Law Treatise* § 9.2, at 7 (3d ed.1994) [hereinafter Davis, *Administrative Law*]. The source of such a constitutional right is the Due Process Clause of the Fourteenth Amendment to the federal Constitution or article I, section 9 of the Iowa Constitution. *Sindlinger v. Iowa State Bd. of Regents,* 503 N.W.2d 387, 390 (Iowa 1993). If the agency determination turns only on legislative facts, a person is not constitutionally entitled to such a hearing. Bernard Schwartz, *Administrative Law* § 71, at 202 (1976). Legislative facts "are the general facts that help a government institution decide questions of law, policy and discretion." 2 Davis, *Administrative Law* § 9.2, at 7; *see also* Schwartz, *Administrative Law* § 71, at 200–03.

As mentioned, agency action to establish location of a road is legislative. 39 Am. Jur.2d *Highways, Streets, and Bridges* § 49, at 438. Consequently, there is no due process right to an evidentiary hearing. *See L'Enfant Plaza Properties, Inc. v. District of Columbia Redevelopment Land Agency,* 564 F.2d 515, 524–25 (D.C.Cir.1977); *Chevy Chase Citizens Ass'n v. District of Columbia Council,* 327 A.2d 310, 315–16 (D.C.1974); *Ashwaubenon v. State Highway Comm'n,* 17 Wis.2d 120, 115 N.W.2d 498, 504 (1962).

Here, section 306.9 does not provide for a hearing of any kind. The record shows, however, that the appellees conducted a number of public hearings to inform the community and the affected parties about the proposed project and to elicit their views on the design and route. Such hearings are required to allow the state to qualify for federal funding under 23 U.S.C. § 128. In *Citizens,* the Court characterized these hearings under this federal statute as "nonadjudicatory, quasi-legislative in nature." *Citizens,* 401 U.S. at 415, 91 S.Ct. at 823, 28 L.Ed.2d at 152. In addition, the Court noted that the hearings are "not designed to produce a record that is to be the basis of agency action—the basic requirement for substantial evidence review." *Id.*

We conclude the commission was acting legislatively when it chose Alternate C. It was deciding where a road *would be* and *why*—what policies, engineering issues, community needs and fiscal constraints would come into play. Admittedly, the commission's decision fell hard upon a small number of people, suggesting that an adjudicative hearing might be desirable. Nevertheless, the entire location process involved the interests of many people, perhaps hundreds. To conclude that due process requires a trial-type proceeding before final selection of a proposed route implicates a huge number of potential "mini-trials" by every person or entity impacted by a possible road.

Because the commission was acting legislatively, appellants were not constitutionally entitled to a contested case hearing.

■■■ The federal and state Constitutions are only one source of entitlement to a contested case hearing, the other is statutory. Iowa Code § 17A.2(5); *Sindlinger,* 503 N.W.2d at 390. As we mentioned, section 306.9 is silent as to any requirement for a hearing, much less a contested case hearing. Unless the statute *mandates* a contested case hearing, none is required. *Sindlinger,* 503 N.W.2d at 388–89. We conclude the appellants have no statutory right to a contested case hearing.

The district court correctly ruled that the appellees were not required to hold a contested case hearing.

## VI. *Corridor Hearing.*

The appellants last contend that the appellees erred in failing to hold a separate corridor hearing in the selection of Alternate C.

The appellants concede numerous public informational hearings were held. They also concede they were given the opportunity to voice their concerns. They contend, however, that due process requires a more meaningful participation in the decision making process. For example, the appellants insist that they had a due process right to cross-examine the decision makers *before* the decision makers made their final decision.

The appellants cite no authority for this novel proposition, which flies in the face of our holding that neither due process nor section 306.9 requires an evidentiary hearing. In short, there is no inherent right to cross-examination in a legislative hearing concerning a proposed location of a highway. *Harris v. Hornbaker*, 98 Wash.2d 650, 658 P.2d 1219, 1224 (1983); *see* 1 Davis, *Administrative Law* § 7.8, at 347.

The district court correctly ruled the appellants were not denied due process regarding the appellants' corridor hearing claim.

### VII. *Disposition.*

In sum, we conclude the district court correctly ruled that the commission did not violate the statutory requirements of Iowa Code section 306.9 when it selected Alternate C. The court also correctly determined that the IDOT was under no duty to promulgate a rule implementing Iowa Code section 306.9. In addition, the court correctly decided that the IDOT was not required to give the appellants a contested case hearing or to provide a corridor hearing in which the appellants would have the opportunity to cross-examine the commission members. We therefore affirm.

**AFFIRMED.**